No. 18-55635

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DENISE DANIELS AND THE MOODSTERS COMPANY,
*Plaintiffs-Appellants,*

v.

THE WALT DISNEY COMPANY; DISNEY ENTERPRISES, INC.;
DISNEY CONSUMER PRODUCTS AND INTERACTIVE MEDIA INC.;
DISNEY INTERACTIVE STUDIOS, INC.; DISNEY SHOPPING, INC.;
PIXAR,
*Defendants-Appellees*

---

*On Appeal from the United States District Court for the Central District of California,
No. 2:17-cv-04527-PSG-SK, Honorable Philip S. Gutierrez*

---

### APPELLANTS' OPENING BRIEF

ROBINS KAPLAN LLP
Ronald J. Schutz
Patrick M. Arenz
Brenda L. Joly
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

*Attorneys for Plaintiffs-Appellants Denise
Daniels and The Moodsters Company*

**CORPORATE DISCLOSURE STATEMENT**

Under Rule 26.1 of the Federal Rules of Appellate Procedure, plaintiffs-appellants Denise Daniels and The Moodsters Company state that The Moodsters Company has no parent corporation, and no publicly held corporation holds 10% or more of its stock.

Date: August 24, 2018

*/s/ Patrick M. Arenz*
Patrick M. Arenz
*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.......................................................i

TABLE OF AUTHORITIES................................................................ v

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT .......................................................4

ISSUES PRESENTED ..................................................................4

STATEMENT OF THE CASE...........................................................6

A.   Denise Daniels is a nationally recognized child development
     expert. ...........................................................................6

B.   Daniels founded The Moodsters Company to continue her
     dedication for children's social and emotional development...............7

C.   One year after Moodsters Co.'s five years' of pitches, Disney
     started working on *Inside Out* in 2010, which became one of its
     most successful movies of all time. .........................................10

D.   The Moodsters characters continue to this day....................................11

E.   The district court dismissed all claims on the pleadings.....................12

SUMMARY OF THE ARGUMENT..................................................15

STANDARD OF REVIEW .................................................................17

ARGUMENT.........................................................................18

     I.    The district court erred when it dismissed Moodsters Co.'s
           copyright claims because the Amended Complaint alleges
           plausible claims that The Moodsters—individually and
           collectively—are copyrighted characters. ................................. 18

A. The district court erred because it decided the "fact-intensive" copyright issue on the pleadings, instead of assessing plausibility............................................................. 20

B. Moodsters Co. pled plausible claims for copyright infringement, and the district court erred by applying a heightened standard. ........................................................... 26

   1. The Amended Complaint pled a plausible claim that The Moodsters ensemble satisfies the *Towle* standard. ............ 27

      a. The Moodsters are sufficiently delineated. ................... 28

      b. The Moodsters are especially distinctive. ..................... 31

      c. Courts have recognized that an ensemble of characters may be protected............................................................ 33

   2. The Amended Complaint pled a plausible claim that each individual Moodsters character is a copyrighted character. ......................................................................... 33

      a. The Anger character is sufficiently delineated. ............. 34

      b. The Anger character is especially distinctive. ............... 35

C. The district court made several legal errors in misapplying the test for character copyrights and violated fundamental aspects of copyright law......................................................... 36

   1. The district court erred by deciding fact issues contrary to the allegations in the complaint......................................... 36

   2. The district court erred by making copyright protection dependent on a showing of fame or amount of distribution...................................................................... 38

      a. The district court erred by focusing on events occurring after The Moodsters were reduced to a fixed medium to determine copyrightability. ........................ 42

     b. If after-fixation events matter, then the district court erred by disregarding the allegations regarding the second generation of The Moodsters. .......................... 44

    D. The "story being told" test confirms a plausible claim. .......... 48

II.    The district court erred when it dismissed Daniels' breach of implied-contract claim. ............................................................ 49

    A. The district court resolved inferences against Daniels based on its interpretation of copyright records. .............................. 49

    B. The district court erred because the consideration for a *Desny* contract is the service of conveying an idea unknown to the recipient, even though others may know about the idea ......... 52

CONCLUSION .................................................................................56

REQUEST FOR ORAL ARGUMENT ................................................57

STATEMENT OF RELATED CASES ................................................57

CERTIFICATE OF COMPLIANCE ...................................................57

CERTIFICATE OF SERVICE ............................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Stallone*,
  11 U.S.P.Q.2d 1161 (C.D. Cal. 1989).......................................... 33

*Azaria v. Bierko*,
  No. CV 12-9732 GAF, 2014 U.S. Dist. LEXIS 190372 (C.D.
  Cal. Feb. 21, 2014) ...................................................... 38, 41, 43

*Bach v. Forever Living Prods. U.S., Inc.*,
  473 F. Supp. 2d 1127 (W.D. Wash. 2007) ...........................31, 38, 41, 43

*Barker v. Riverside County Office of Educ.*,
  581 F.3d 821 (9th Cir. 2009) ...................................................... 45

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ...................................................... 52

*Bleistein v. Donaldson Lithographing Co.*,
  188 U.S. 239 (1903) ...................................................... 30

*Blizzard Entm't, Inc. v. Lilith Games Co.*,
  149 F. Supp. 3d 1167 (N.D. Cal. 2015)...................................................... 20

*Blizzard Entm't, Inc. v. Lilith Games Co.*,
  No. 15-cv-04084-CRB, 2018 U.S. Dist. LEXIS 39341 (N.D.
  Cal. Mar. 8, 2018)...................................................... 20

*CDN Inc. v. Kapes*,
  197 F.3d 1256 (9th Cir. 1999)...................................................... 40

*Chandler v. Roach*,
  319 P.2d 776 (Cal. Ct. App. 1957)......................................................52, 53

*Cheffins v. Stewart*,
  825 F.3d 588 (9th Cir. 2016) ...................................................... 30

*Conley v. Gibson*,
  355 U.S. 41 (1957) ...................................................... 27

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .................................................. 25

*DC Comics v. Towle,*
  802 F.3d 1012 (9th Cir. 2015)..........................................*passim*

*Desny v. Wilder,*
  299 P.2d 257 (Cal. 1956).................................................*passim*

*Dezendorf v. Twentieth Century-Fox Film Corp.*,
  99 F.2d 850 (9th Cir. 1938) ................................................... 21

*Dimick v. Schiedt*,
  293 U.S. 474 (1935) ............................................................. 25

*Direct Techs., LLC v. Elec. Arts, Inc.*,
  836 F.3d 1059 (9th Cir. 2016)................................................ 25

*Disney Enters. v. Sarelli*,
  No. 16 Civ. 2340 (GBD), 2018 U.S. Dist. LEXIS 137429
  (S.D.N.Y. Aug. 9, 2018) ..................................................26, 33

*Dolman v. Agee*,
  157 F.3d 708 (9th Cir. 1998) ................................................. 51

*Donahue v. Ziv. Television Programs, Inc.*,
  54 Cal. Rptr. 130 (Cal. Ct. App. 1966) ................................. 52

*Edgar Rice Burroughs, Inc. v. Manns Theatres*,
  195 U.S.P.Q. 159 (C.D. Cal. 1976) ...................................38, 39

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ..........................................................21, 40

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998) ............................................................. 25

*Fleischer Studios, Inc. v. A.V.E.L.A. Inc.*,
  772 F. Supp. 2d 1135 (C.D. Cal. 2008), *aff'd* 654 F.3d 958 (9th
  Cir. 2011) .............................................................................. 39

*Gaiman v. McFarlane*,
  360 F.3d 644 (7th Cir. 2004) .............................................31, 39

*Garter-Bare Co. v. Munsingwear, Inc.*,
 723 F.2d 707 (9th Cir. 1984) ................................................... 21

*Gen. Elec. Co. v. Nintendo Co.*,
 179 F.3d 1350 (Fed. Cir. 1999)................................................ 21

*Gilligan v. Jamco Dev. Corp.*,
 108 F.3d 246 (9th Cir. 1997) ...........................................21, 27

*Green v. Schwarzenegger*,
 No. CV 93-5893-WMB, 1995 U.S. Dist. LEXIS 14031 (C.D.
 Cal. July 11, 1995)................................................................. 54

*Grosso v. Miramax Film Corp.*,
 383 F.3d 965 (9th Cir. 2004) ................................................. 52

*Halicki Films, LLC v. Sanderson Sales & Marketing*,
 547 F.3d 1213 (9th Cir. 2008)...........................................*passim*

*Halicki v. Carroll Shelby Int'l*,
 No. 04-08813, Dkt No. 330 (C.D. Cal. Aug. 12, 2009)................. 24, 37, 40

*In re Osborne*,
 76 F.3d 306 (9th Cir. 1996) ................................................... 49

*In re U.S. Financial Sec. Litig.*,
 609 F.2d 411 (9th Cir. 1979) ................................................. 25

*J.W. v. Fresno Unified Sch. Dist.*,
 626 F.3d 431 (9th Cir. 2010) ................................................. 51

*JB Oxford & Co. v. First Tenn. Bank Nat'l Ass'n*,
 427 F. Supp. 2d 784 (M.D. Tenn. 2006) ................................ 39

*Jones v. Johnson*,
 781 F.2d 769 (9th Cir. 1986), *overruled as to a different part by
 Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc)......................... 27

*L.A. Printex Indus., Inc. v. Aeropostale*,
 676 F.3d 841 (9th Cir. 2012) ................................................. 33

*Lee v. City of Los Angeles*,
 250 F.3d 668 (9th Cir. 2001) ................................................. 50

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
  900 F. Supp. 1287 (C.D. Cal. 1995)...................................................40, 46

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) .............................................................54, 55

*Newcal Indus., Inc. v. IKON Office Solution*,
  513 F.3d 1038 (9th Cir. 2008)................................................................ 22

*North Coast Indus. v. Jason Maxwell, Inc.*,
  972 F.2d 1031 (9th Cir. 1992)................................................................ 21

*Paramount Pictures Corp. v. Axanar Prods.*,
  No. 2:15-CV-09938-RGK-E, 2017 U.S. Dist. LEXIS 19670
  (C.D. Cal. Jan. 3, 2017) ....................................................................31, 33

*Parks Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480 (9th Cir. 1995) ................................................................. 27

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ................................................................. 17

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  134 S.Ct. 1962 (2014)........................................................................... 48

*Pivot Point Int'l Inc. v. Charles Prods., Inc.*,
  372 F.3d 913 (7th Cir. 2004) ................................................................. 30

*Quirk v. Sony Pictures Entm't, Inc.*,
  No. C11-3773, 2012 U.S. Dist. LEXIS 107362 (N.D. Cal. July
  5, 2012) ............................................................................................... 55

*Quirk v. Sony Pictures Entm't, Inc.*,
  No. C11-3773, 2013 U.S. Dist. LEXIS 47954 (N.D. Cal. Apr.
  2, 2013) ...........................................................................................54, 55

*Rice v. Fox Broadcasting Co.*,
  330 F.3d 1170 (9th Cir. 2003)..........................................................*passim*

*Roth Greeting Cards v. United Card Co.*,
  429 F.2d 1106 (9th Cir. 1970)................................................................ 40

*Sapon v. DC Comics,*
 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002) ................................................38, 46

*Scheuer v. Rhodes,*
 416 U.S. 232 (1974) ................................................................ 45

*Starr v. Baca,*
 652 F.3d 1202 (9th Cir. 2011) ................................................ 21

*Stewart v. Abend,*
 495 U.S. 207 (1990) ................................................................ 42

*Three Boys Music Corp. v. Bolton,*
 212 F.3d 477 (9th Cir. 2000) ................................................ 26

*Toho Co., Ltd. v. William Morrow & Co.,*
 33 F. Supp. 2d 1206 (C.D. Cal. 1998)................................... 38

*Twentieth Century Music Corp. v. Aiken,*
 422 U.S. 151 (1975) ................................................................ 42

*United Transp. Union v. BNSF Ry. Co.,*
 710 F.3d 915 (9th Cir. 2013) ................................................ 26

*Vassigh v. Bai Brands LLC,*
 No. 14-cv-05127-HSG, 2015 U.S. Dist. LEXIS 90675 (N.D.
 Cal. July 13, 2015) ................................................................ 22

*Vigil v. Walt Disney Co.,*
 No. C-95-1790-MHP, 1995 U.S. Dist. LEXIS 15560 (N.D. Cal.
 Oct. 16, 1995) ................................................................ 42

*Walt Disney Productions v. Air Pirates,*
 581 F.2d 751 (9th Cir. 1978) ........................................*passim*

*Warner Brothers Pictures, Inc. v. Columbia Broadcasting System, Inc.,*
 216 F.2d 945 (9th Cir. 1954) ........................................18, 48

*Weitzenkorn v. Lesser,*
 256 P.2d 947 (Cal. 1953) (en banc)........................................ 53

*West v. Ebay, Inc.*,
  No. 1:17-cv-285, 2017 U.S. Dist. LEXIS 197786 (N.D.N.Y.
  Dec. 1, 2017) .......................................................................... 53

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) ............................................... 21

**Statutes**

17 U.S.C. § 101 ...........................................................................42, 50

17 U.S.C. §§ 101-1101 ..................................................................4, 42

17 U.S.C. § 103(b) .......................................................................43, 48

17 U.S.C. § 302(a) ........................................................................... 42

17 U.S.C. § 501 ............................................................................... 48

17 U.S.C. § 504 ............................................................................... 48

28 U.S.C. § 1291 ............................................................................... 4

28 U.S.C. § 1331 ............................................................................... 4

28 U.S.C. § 1332 ............................................................................... 4

28 U.S.C. § 1338(a) ........................................................................... 4

28 U.S.C. § 1367 ............................................................................... 4

**Rules**

Fed. R. Civ. P. 8............................................................................... 26

Fed. R. Civ. P. 12.......................................................................*passim*

**Other Authorities**

H.R. Rep. No. 94-1476 (1976) ....................................................... 50

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
  2.12[A][3][b] n.50 (2017) ........................................................ 39

# INTRODUCTION

Emotions are abstract. No one knows what they look like, or what color they may be. Scientists dispute how many even exist. This case is about an experienced child development expert bringing emotions to life through an expressive, creative, and—above all—original set of characters.

Denise Daniels conceived of an idea to personify emotions as anthropomorphic characters that lived inside a child. She expressed that idea through five characters called The Moodsters. Each character represented a single emotion, matched by a core body color: Happiness (yellow); Sadness (blue); Anger (red); Fear (green); and Love (pink). Each character had other individually expressive traits as well, like the Anger character exploding from the head when furious.

Daniels then formed The Moodsters Company to develop a children's entertainment program around The Moodsters characters. Daniels recruited industry veterans with successful experiences at Disney and PBS to join as Executive Producers. That team then tested The Moodsters characters in laboratories at Yale University with leading experts on emotional intelligence. And their focus groups confirmed that diverse audiences enjoyed and understood these characters. With this team of experts, Moodsters Co. completed a 24-minute pilot episode in 2007. This work consumed most of the

$3 million investment that Daniels and her team had raised for their innovative concept.

Daniels and Moodsters Co. looked for a partner to bring these characters to a broader audience. Disney was an obvious candidate. Disney had never before offered a movie or television program for anything like The Moodsters. Indeed, no other company had either. From 2005 through 2009, Daniels and her team presented The Moodsters characters to Disney executives; Roy E. Disney—the son and nephew of Disney's original founders; and lastly, to Pete Docter—the famous Pixar director. After supposedly declining the opportunity (while also praising The Moodsters characters), Disney and Docter started working in 2010 on a movie—*Inside Out*—featuring five single emotion characters that reside inside a child. Disney released *Inside Out* in 2015, and has since generated more than $1 billion.

Daniels and Moodsters Co. sued Defendants-Appellees ("Disney") in 2017 because Disney stole her idea and copied the Moodsters Co.'s characters. But Daniels and Moodsters Co. never had their day in court. Instead, the district court dismissed their 88-page detailed complaint on the pleadings—all without ever giving them a chance to call a single witness or present their case. The district court decided the fact-intensive issue about whether The Moodsters characters are copyright protected, and drew inferences in Disney's

favor when it dismissed the copyright and implied-in-fact contract claims. In doing so, the district court not only violated basic tenets guiding Rule 12 motions, but denied Moodsters Co. its constitutional right to have juries decide facts in copyright cases. The district court misapplied the law for both sets of claims as well.

The district court's decision also undermines copyright law's fundamental purpose. Copyright protection incentivizes creative works, which enrich our culture and drive the economy, because artists obtain the necessary bargaining capital from copyrights to garner a fair price for their original works. The Moodsters characters are unquestionably original, particularly so under a Rule 12 plausibility analysis. But the takeaway from the district court's decision is that anyone can simply copy original characters like these—identically, even—and a creator like Moodsters Co. has no recourse under United States copyright law. Left to stand, the district court's order will discourage investment in start-up companies like Moodsters Co., and reduce creative works passing to the public. The district court's decision would serve as a dangerous precedent. This Court should reverse.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1338(a) and 1367, and 17 U.S.C. §§ 101, *et seq*. The district court entered a final judgment in Disney's favor on May 9, 2018. ER1-10. Plaintiffs filed a timely notice of appeal on May 16, 2018. ER21-22. This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. **Copyright Claims.** Whether the district court erred when it dismissed Moodsters Co.'s five copyright infringement claims on Disney's Rule 12(b)(6) motion, including the following subsidiary issues.

   a. Whether copyright law protects a character is a "fact-intensive issue." Moodsters Co. detailed many specific attributes of five single-emotion characters that were unique and not found in earlier works. Did the district court err by resolving factual issues against Moodsters Co. and deciding on the pleadings that The Moodsters characters—as an ensemble and individually—were not eligible for copyright protection?

   b. While literary characters ordinarily are not copyrighted, copyright law extends much greater protection to animated characters. The Moodsters are five single-emotion animated characters delineated by distinctive,

expressive traits. Did the district court err when it required Moodsters Co. to prove on the pleadings that The Moodsters displayed traits on par with "iconic" characters, like Superman, Sherlock Holmes, Tarzan, and James Bond?

c. Copyright protection begins when an artist reduces an original expression to a fixed medium. The Moodsters characters were expressed in a "bible" in 2005 and a 24-minute pilot episode in 2007. Was it legal error for the district court to require Moodsters Co. to present evidence of the fame and distribution of these characters *after* they were reduced to a fixed medium to determine copyrightability?

d. This Court has never overruled its original "story being told" test to determine if a literary character is copyrighted. Moodsters Co. alleged in its complaint that the ensemble of The Moodsters characters meets this test. Did the district court err by refusing to consider that alternate test for copyright protection of characters, in addition to the three-part test this Court stated in *Towle*?

2. **Breach of Implied-in-fact Contract (*Desny)* Claim**. Whether the district court erred when it dismissed Daniels' *Desny* claim, including the following subsidiary issues.

a. "Publication" in copyright law includes offering to distribute copies for purposes of further distribution to others. Daniels published *The Moodsters* by disclosing it to Disney for production to larger audiences in exchange for compensation. Did the district court err by inferring—on a Rule 12 motion and contrary to the allegations in the complaint about the "pitch" materials—that "publication" referred to in a copyright registration meant Daniels' idea was "freely available?"

b. The law implies a contract when an artist agrees to disclose an idea to a producer that was unknown to the producer. Daniels disclosed her original idea for single-emotion characters to Disney from 2005 through 2009. Did the district court err when it dismissed Daniels' claim because of her narrow distribution of this idea to others during this timeframe?

## STATEMENT OF THE CASE

### A. Denise Daniels is a nationally recognized child development expert.

Denise Daniels has over 40 years of experience promoting children's social and emotional development. ER76-78 ¶¶26-35. In 1986, Daniels co-founded the national non-profit National Childhood Grief Institute. *Id.* ¶27. In that role and through her work, she helped children cope with grief and loss, including with the U.S. Military during Operation Desert Storm, and through

events associated with Columbine, Hurricane Katrina, and September 11th, among other tragedies and national disasters. *Id.* ¶28. Over 15 million copies of her First Aid for Feelings workbook have been distributed to school children. *Id.* Based on Daniels' expertise, she became the first parenting expert for NBC's Today show in 1991. *Id.* ¶29. Pfizer retained Daniels as a consultant to develop a program—which has been used in 200 pediatric units across the U.S.—to help pediatric patients cope with emotional issues. *Id.* ¶¶32-33. She has also published nine children's self-help books. *Id.* ¶35. In short, Daniels has dedicated her entire career to the development of emotional wellbeing in children.

> **B.** **Daniels founded The Moodsters Company to continue her dedication for children's social and emotional development.**

Daniels conceived of The Moodsters characters to foster emotional intelligence in children. ER78-79 ¶¶36-39. While her idea was to bring emotions to life through individual characters, Daniels had a blank slate to work from. Neither Disney nor any other company had embarked on such a unique idea before. ER93-94 ¶¶96-105, ER108-109 ¶¶163-165. Daniels' characters could have been humans, animals, or natural phenomena, among other personifications. ER112-113 ¶¶182-184. She had many emotions to choose from as well, as scientists dispute the number of emotions that exist within a range of 2 through 27. ER114-115 ¶¶185-188. Whether and what

colors to include were also open questions, among many others, like whether the characters should have genders. ER115-116 ¶¶189-191, ER113 ¶183.

Daniels expressed her idea through The Moodsters characters. The Moodsters are five anthropomorphic characters, each individually representing a single emotion matched with a core color—Happiness (yellow), Sadness (blue), Anger (red), Fear (green), and Love (pink). These characters live in an abstract world *inside a child*. ER78 ¶¶37-38, ER82-87 ¶¶51-59. Daniels formed The Moodsters Co. to make these characters a reality. ER78-79 ¶39.

Daniels recruited industry-leading talent to execute her vision for The Moodsters. ER78-81 ¶¶39-49. Lisa Simon and Louise Gikow, for instance, served as co-executive producers, bringing 15 Emmy Awards and experience developing successful Disney and PBS shows (like *Sesame Street*). *Id.* ¶¶40-41. A.J. Dewey was the creative director, whose past clients included Disney, Sesame Street, and Marvel, among others. *Id.* ¶42. Finally, Professor Marc Brackett, currently the Founder and Director of the Yale Center for Emotional Intelligence, served as a curriculum advisor to ensure that *The Moodsters* was based on a science and evidence-based curriculum. *Id.* ¶¶43-46.

Daniels raised over $3 million for investment for Moodsters Co. ER102 ¶146. This investment allowed Moodsters Co. to test and refine the characters in laboratories at Yale University. *Id.* ¶147. Focus groups with children from

diverse backgrounds proved that children understood and liked these characters. *Id.* ¶¶148-149. Two preeminent social scientists endorsed The Moodsters characters, with the late Dr. Candace Pert remarking, "The Moodsters are literally teaching children to control their own brain chemistries." ER102-103 ¶¶150, 152.

Daniels and her team at Moodsters Co. sought a partner to distribute The Moodsters to a broad audience. ER87 ¶60. Their pitch materials took two forms: (1) *The Moodsters* bible, which outlines the television series characters, settings, and other elements, and (2) an animated full-length *The Moodsters* pilot episode. ER81 ¶¶48-49, ER178-295. Precisely because emotions are an abstract concept that no one has ever seen, these pitch materials detail the characters' original, expressive characteristics. *See* ER72-295*, e.g.* ¶¶48-58, 143-152, 163-164, 198-223, 235-260, 271-297, 309-333. The anger character, for example, designated by the color red, explodes from the head when furious. ER85-86 ¶56, ER138.

Daniels and Moodsters Co. pitched The Moodsters to Disney *every* year from 2005 through 2009. ER87-89 ¶¶60-72. For instance, Moodsters Co. had several meetings and discussions with Nancy Kanter and Paula Rosenthal at Disney Junior (formerly Playhouse Disney). *Id.* ¶¶65-66. Daniels shared The Moodsters with Thomas Staggs, the CFO of The Walt Disney Company, who

also then shared those materials with Rich Ross. In 2009, Ross became Chair

of Walt Disney Studios, which distributes films under various banners

including Walt Disney Pictures and Pixar. *Id.* ¶¶67-70. Even Roy E. Disney,

the son and nephew of the founders of The Walt Disney Corporation had

access to The Moodsters. *Id.* ¶68. Finally, Daniels had a detailed phone call

with Pete Docter, when Daniels described The Moodsters characters in detail

to Docter. *Id.* ¶71. Disney—among other entertainment companies like

Nickelodeon, Toys 'R Us, and others—provided positive feedback to

Moodsters Co. about The Moodsters characters, and none suggested they were

generic or lacked distinctive qualities. ER103 ¶¶153-154.

**C.**     **One year after Moodsters Co.'s five years' of pitches, Disney started working on *Inside Out* in 2010, which became one of its most successful movies of all time.**

Before *Inside Out*, Disney had never released an animated feature with

anthropomorphized emotions as individual characters. ER93-94 ¶¶ 96-105. In

fact, such a premise clashed with Disney's original approach to multi-

dimensional characters that made Disney so famous. *Id.* ¶104. In 2010,

nevertheless, Disney and—specifically Docter—started working on Disney's

first ever film with single-emotion characters. ER89 ¶¶73-76, ER90 ¶¶83-85.

Docter has since described the purported challenges he encountered in

the development, including the challenge in how to express the idea of

characters representing emotions given the abstract nature of emotions; Disney's empty experience with such works in the past; as well as the range of options, including the number of emotions to use as characters, and the particular emotions to select. ER89-90 ¶¶76-79. Disney ultimately settled on copying The Moodsters' number of five emotions as characters, and four of the five specific emotions. ER90 ¶¶80-81. Disney released *Inside Out* in theaters in summer 2015. *Id.* ¶82. Critics lauded *Inside Out*, like Anthony Lane of the New Yorker writing "On the scale of inventiveness, 'Inside Out' will be hard to top this year." ER92-93 ¶94. *Inside Out* has been one of Disney's most successful movies of all time. ER92-94 ¶¶92-94, 106-108.

### D. The Moodsters characters continue to this day.

While not the immense commercial success Disney has enjoyed, The Moodsters remain successful today. Daniels released a second-generation of the characters, reflecting a more modern animated design (as is common with animated characters, with Mickey Mouse as a good example). ER104-106 ¶¶156-157. This second generation maintains traits and attributes from the first generation that made these characters so original in the first place. ER106 ¶158. International platforms like Amazon, Walmart, Toys 'R Us (previously), among others, sell toys and books featuring this second generation of The Moodsters. ER105 ¶156. The Today Show, MSN.com, *The Huffington Post*,

among other international news outlets have featured The Moodsters as well. ER105-106 ¶157. The Moodsters also earned several awards and recognitions, including the Parents' Choice Foundation, 2015 National Parenting Publications Awards (Bronze Winner), The National Parenting Center Seal of Approval, and 2016 Dr. Toy 100 Best. *Id.*

### E. The district court dismissed all claims on the pleadings.

Two years after Disney's theatrical release of *Inside Out*, Daniels filed her original Complaint asserting her *Desny* claim. ER402-417. Daniels alleged that Disney breached an implied-in-fact contract with her when Disney used her ideas in the movie *Inside Out* without compensating her. *Id.* Several months later, Daniels amended her complaint and joined Moodsters Co. as a co-plaintiff, which asserted five claims of copyright infringement.[1] ER351-401. Moodsters Co. alleged that Disney infringed Moodsters Co.'s copyrights in the ensemble of The Moodsters characters and four individual Moodsters characters. *Id.*

Disney moved to dismiss this amended complaint, and asked the district court to take judicial notice of over 200 exhibits comprising over 1,300 pages. *See* ER13. The district court heard oral argument in January 2018. ER11.

---

[1] Daniels is the owner of the idea behind The Moodsters. ER95 ¶112. Her company, Moodsters Co., is the owner of all copyrights in The Moodsters. ER100 ¶¶134-136.

Days later, the district court granted Disney's motion to dismiss. *Id.* For the *Desny* claim, the district court relied on a single unpublished district court decision, and inferred from a copyright registration, that Disney asked the court to take judicial notice of, that Daniels' idea was "freely available" and "cannot, therefore, give rise to an implied-in-fact contract claim." ER14-15. The court also dismissed Moodsters Co.'s five copyright claims. ER16-19. The court decided that the traits for the individual Moodsters characters were not "on par with those of the iconic characters" like Sherlock Holmes, Tarzan, Superman, and James Bond. ER17. The court also concluded that The Moodsters were not famous enough, focusing on limited distribution and lack of persistence "over time or over multiple iterations." *Id.* The court granted Moodsters Co. leave to amend the copyright claims, but denied Daniels the ability to amend her breach of implied contract claim. ER19-20. Moodsters Co. filed its 88-page second amended complaint in spring 2018.[2] ER72-160. This Amended Complaint addressed in detail the concerns expressed by the district court. *Id.*

The district court dismissed the Amended Complaint as well. ER1-10. First, the court was "unpersuaded" that the second generation Moodsters could be widely and instantly recognized as the same characters because of the

---

[2] Moodsters Co. will refer to this version as the Amended Complaint in this brief.

court's perceived differences among the generations, including physical differences, like arm length, and changes to their individual names. ER5-6. So the court concluded that The Moodsters characters "still fell short of the Ninth Circuit's rigorous test" for copyrightability. ER7-8. The court ended its decision by finding that The Moodsters as an ensemble "are neither delineated nor distinctive" to a degree sufficient for copyright protection, and declined to apply this Court's "story being told" test. ER8-9.

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment because the district court erred in its dismissal of Moodsters Co.'s five copyright claims and Daniels' implied-in-fact contract claim on the pleadings.

1. The district court erred when it decided that copyright law does not protect The Moodsters characters—individually or collectively. The district court misapplied procedural and substantive law in its decision.

First, this Court has held that whether a character is protected by copyright is a "fact-intensive issue." The district court's proper role on Disney's Rule 12 motion was to determine whether Moodsters Co. stated a plausible—even if not probable—claim that The Moodsters satisfy this fact-based standard. But the district court did not conduct this analysis. It did not analyze the particularized allegations Moodsters Co. made in its 88-page Amended Complaint, including the detailed attributes that delineate Moodsters characters over earlier works. Instead, the district court decided the ultimate question of copyright validity on the merits of Moodsters Co.'s claims in Disney's favor without any evidentiary record.

Second, the district court applied a "rigorous" standard that does not exist. While copyright law protects *literary* characters only in rare circumstances, the same is not true for *graphical* characters. To the contrary,

this Court has observed that an inanimate car with minimal thematic attributes may qualify as a copyrighted character. The district court erred when it ignored this Court's *Halicki* decision, and required Moodsters Co. to show traits and characteristics on par with "iconic characters," like James Bond and Superman.

Third, the district court erred when it required evidence about fame and distribution of The Moodsters characters to determine copyrightability. Copyrights exist when a creative artist reduces an original work to a fixed medium. The validity of that copyright does not depend on future events, including whether the work becomes popular. But even if that were the law, the district court still erred by refusing to consider the success of the second generation of The Moodsters characters.

Fourth, this Court has never overruled the "story being told" test for character copyrights. The district court erred when it refused to consider Moodsters Co.'s well-pled allegations that its characters met this test.

2. The district court erred when it dismissed Daniels' implied-in-fact *Desny* claim for two reasons.

First, the district court drew inferences in Disney's favor when it concluded that Daniels' idea was "freely available." Publication in copyright law includes disclosures *for purposes of further distribution*. That is what Daniels

did when she disclosed her idea to Disney. And that fact is not inconsistent with an expectation that Disney compensate Daniels if it used her idea. The record below does not support the district court's inference that "publication" meant Daniels had made her idea "freely available" for all to use.

Second, the district court misunderstood the elements of an implied-in-fact contract *Desny* claim. California law does not require Daniels to plead that her idea was confidential to all when she disclosed it to Disney. Instead, California law will find sufficient consideration if *the recipient*—like Disney here—did not know of the idea at the time of disclosure. The district court misapplied the law, in its reliance on an unpublished district court case not analogous to the facts as pled here.

This Court should reverse the district court's order granting the motion to dismiss the complaint, and remand the case to the district court, so Moodsters Co.'s and Daniels' claims may be decided on the merits with a proper evidentiary record.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant a motion to dismiss. *See*, *e.g., Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 665 (9th Cir. 2017).

I. **The district court erred when it dismissed Moodsters Co.'s copyright claims because the Amended Complaint alleges plausible claims that The Moodsters—individually and collectively—are copyrighted characters.**

This Court has decided five significant cases on character copyrights.

This Court first addressed the subject in *Warner Brothers Pictures, Inc. v. Columbia Broadcasting System, Inc.*, and determined that copyright law may protect a literary character if he is the "story being told," and not just a mere "chessman in the game of telling the story." 216 F.2d 945, 950 (9th Cir. 1954). Two decades later, this Court recognized a different, lower standard for animated characters in *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978). Following Disney's zealous advocacy to protect more than twenty-one of its characters,[3] this Court held that while literary characters

---

[3] It cannot be gainsaid that the Courts of the United States have *long recognized* and *afforded protection* to the creators of fictional characters, and that in each instance the Courts have recognized that characters are often the most valuable portion of the particular works or properties of which they are a part.

\*\*\*

The critical fact is that we are *not* here concerned with a character (e.g. Sam Spade) developed in a *work of literature*. We are rather dealing with distinctive depictions created by drawings. The identification of the figures developed by those drawings transcends the works (e.g. comic books) in which they appear.

"ordinarily are not copyrightable," the same is not true for animated characters because they have "physical as well as conceptual qualities" and thus they are "more likely to contain some unique elements of expression." *Id.* at 755. Next, the Court explained that copyright law does not protect generic (stock) characters in *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003). The Court affirmed summary judgment against the plaintiff, holding that no character copyright protects a generic character like a magician who "dressed in standard magician garb—black tuxedo with tails, a white tuxedo shirt, a black bow tie, and a black cape with red lining" and limited his role "to performing and revealing the magic tricks." *Id.* at 1175.

In *Halicki Films, LLC v. Sanderson Sales & Marketing*, this Court held that character copyright analysis is a "fact-intensive issue," and suggested that even the inanimate car in the movie *Gone in 60 Seconds*—"Eleanor"—was likely copyrighted. 547 F.3d 1213, 1224-25 (9th Cir. 2008). Most recently, this Court set forth a three-part test in *DC Comics v. Towle,* when addressing the Batmobile, explaining that a character must (1) have "physical as well as conceptual qualities," (2) "be 'sufficiently delineated' to be recognizable as the same character whenever it appears," and (3) be "'especially distinctive' and

---

ER347-348 (Disney's *Air Pirates* Brief) (emphasis added); *see also Air Pirates,* 581 F.2d at 753 n.5 (explaining at least 21 characters at issue on appeal).

'contain some unique elements of expression.'" 802 F.3d 1012, 1020-21 (9th Cir. 2015) (citations omitted).

None of these cases supports the district court's dismissal of Moodsters Co.'s detailed amended copyright claims. None of them involved a motion to dismiss. And none of these cases supports the heightened standard that the district court required of Moodsters Co. just for the opportunity to develop and present its case on the merits.

## A. The district court erred because it decided the "fact-intensive" copyright issue on the pleadings, instead of assessing plausibility.

This Court has not endorsed dismissal of a character copyright claim on the pleadings. Nor did the district court (or Disney) identify a *single* district court decision that dismissed a character copyright case at the pleadings stage.[4] This absence of case law supporting Disney comports with this Court's guidance that "the motion to dismiss for failure to state a claim is viewed with

---

[4] The *only* decision in either of the district court's two orders that addressed character copyrights on a motion to dismiss was *Blizzard Entm't, Inc. v. Lilith Games Co.*, 149 F. Supp. 3d 1167 (N.D. Cal. 2015). But the *Blizzard* decision involved a complaint vaguely alleging copyright infringement of "dozens of characters" from various video games. *Id.* at 1169-70, 1174-76. The district court allowed a more detailed complaint, and the case proceeded well past the pleadings. *See id.; Blizzard Entm't, Inc. v. Lilith Games Co.,* No. 15-cv-04084-CRB, 2018 U.S. Dist. LEXIS 39341 (N.D. Cal. Mar. 8, 2018). *Blizzard* bears no resemblance to Moodsters Co.'s complaint, and thus offers no support for the District Court's dismissal of Moodsters Co.'s detailed complaint here.

disfavor and is rarely granted." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249

(9th Cir. 1997) (citation omitted).

This guidance serves with particular force with challenges to the validity

of a copyright because originality is the touchstone of copyright protection.

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 347 (1991). And the

"question of originality" in copyright law "is one of fact, not of law; one that

may not be summarily disposed of upon a motion to dismiss, but which must

be established by proof." *Dezendorf v. Twentieth Century-Fox Film Corp.*, 99 F.2d

850, 851 (9th Cir. 1938); *see also North Coast Indus. v. Jason Maxwell, Inc.*, 972

F.2d 1031, 1033, 1035 (9th Cir. 1992) ("Originality is the indispensable

prerequisite for copyrightability" and "plaintiff was entitled to have the validity

of its copyright determined by a trier-of-fact").[5] The only proper analysis at the

pleadings stage is whether Moodsters Co. alleged a plausible claim, even if it is

not probable. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). Here,

Moodsters Co.'s 88-page Amended Complaint alleges plausible copyright

---

[5] Fact issues underlie the validity of all other forms of intellectual property as
well. *See, e.g., Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113
(9th Cir. 2010) ("The issue of trademark validity is considered an intensely
factual issue."); *Garter-Bare Co. v. Munsingwear, Inc.*, 723 F.2d 707, 714-15 (9th
Cir. 1984) (reinstating jury's factual findings about existence of trade secret);
*Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999) (whether
prior art invalidates a patent by anticipation is a question of fact).

claims. It should not be the first character copyright case dismissed on the pleadings, and affirmed by this Court.

This Court's precedent shows that the district court erred when it decided Moodsters Co.'s character copyright claims on the pleadings. In *Halicki*, this Court considered whether the car "Eleanor" in the movie *Gone in 60 Seconds* was a copyrighted character. 547 F.3d at 1224-25. The district court did not expressly address that issue in its summary judgment order, but had implied that Eleanor was a copyrighted character. *Id.* The Ninth Circuit thus remanded the "fact-intensive issue" "for a finding in the first instance as to whether Eleanor is entitled to copyright protection." *Id.* at 1225. The district court's dismissal here fails from the start as a result because courts do not resolve fact issues on the pleadings. *See, e.g.*, *Vassigh v. Bai Brands LLC*, No. 14-cv-05127-HSG, 2015 U.S. Dist. LEXIS 90675 at *9 (N.D. Cal. July 13, 2015) ("the Court will not 'assume the role of the fact-finder in the guise of determining plausibility' when deciding a motion to dismiss"); *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1051 (9th Cir. 2008) ("[Defendant-Appellee's] arguments, however, all hinge on factual disagreements rather than legal deficiencies, such that the arguments do not support affirmance of the Rule 12(b)(6) dismissal.").

The relevant facts in *Halicki* illuminate the district court's error below. The Eleanor character appeared in two movies: the original *Gone in 60 Seconds* released in 1974, and Disney's remake of the same movie in 2000. *Halicki,* 547 F.3d at 1217-18. The original Eleanor was a yellow 1971 Fastback Ford Mustang, while the remake Eleanor was a grey 1967 Shelby GT-500. *Id.; see also* ER64.

The cars in these movies have no personality, nor can they emote. The cars are simply cars—capable only of doing things that cars typically do. Even so, and despite obvious physical changes to the model and color in the original and remake Eleanor, the Court acknowledged that Eleanor "'display[s] consistent, widely identifiable traits,' … and is 'especially distinctive.'" 547 F.3d at 1225 (first alternation in original, citations omitted). This Court explained that "[i]n both films, the thefts of the other cars go largely as planned, but whenever the main human character tries to steal Eleanor, circumstances invariably become complicated." *Id.* This Court then remanded the "fact-intensive issue" about "whether Eleanor's 'physical as well as conceptual qualities [and] . . . unique elements of expression' qualify Eleanor for copyright protection." *Id.* (quoting *Air Pirates*, 581 F.2d at 755) (ellipsis in original). On remand, the district court determined that a *jury* must resolve the fact dispute over the protectability of the Eleanor character. *Halicki v. Carroll*

*Shelby Int'l*, No. 04-08813, Dkt No. 330 at 1, 13-16 (C.D. Cal. Aug. 12, 2009))

(*Halicki II*) (ER26, ER38-41).

Just as this Court and the district court were unable to resolve the fact

issues in *Halicki* (even with a complete record following discovery), so must the

district court's decision here to dismiss copyright claims about The Moodsters

fail. The Moodsters characters are far more original, detailed, and descriptive

than the inanimate cars in *Gone in 60 Seconds*. The Amended Complaint sets

forth detailed allegations of facts that support the copyrightability of The

Moodsters characters, including comparisons with earlier works, alternative

methods for expressing the idea of single-emotion characters, and an

identification of a preeminent expert witness in animation history who will

opine on material issues. *See* ER72-159, *e.g.* ¶¶96-105, 138-167, 179-192, 198-

223, 235-260, 271-297, 309-333. As explained in more detail in Section I.B

below, the record sets forth a plausible claim, and the district court

impermissibly denied Moodsters Co. its opportunity to develop its case for the

trier of fact to decide on the merits.

Remarkably, both the district court and Disney avoided *Halicki* at all

costs. Moodsters Co. emphasized the importance of *Halicki* in briefing and oral

argument. *See* ER66-69, ER325-326, ER337. Yet neither of the District Court's

two orders references *Halicki*. *See generally* ER1-20. And Disney relegated its

only reference to *Halicki* to a footnote in a reply brief and avoided its holdings. ER25. In short, neither the district court nor Disney addressed Moodsters Co.'s repeated arguments that determination of character copyrights presents fact issues.

The district court's failure to address this issue is a matter of constitutional significance. To start, "the importance of the civil right to jury trial should not be underestimated." *In re U.S. Financial Sec. Litig.*, 609 F.2d 411, 419 (9th Cir. 1979). "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). The Seventh Amendment undisputedly applies to copyright actions. *See, e.g., Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-49 (1998). Moodsters Co., thus, "has a constitutional right to a jury trial on [its] copyright infringement claims." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) (citations omitted). Thus, juries—not judges—decide "fact-intensive" questions in copyright cases. *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067-68 (9th Cir. 2016) (reversing summary judgment decision because "it is the role of the jury, not a court on summary judgment, to determine the facts"). The

district court's decision not only exceeds a proper plausibility analysis under Rule 12, but it also violates Moodsters Co.'s right to trial by jury.

### B. Moodsters Co. pled plausible claims for copyright infringement, and the district court erred by applying a heightened standard.

Moodsters Co.'s Amended Complaint details plausible claims for copyright infringement. To start, "[r]egistration is prima facie evidence of the validity of a copyright." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 488-89 (9th Cir. 2000). Ownership in the copyright of *The Moodsters* includes "all the copyrightable component parts of the work copyrighted," such as animated characters. *Air Pirates*, 581 F.2d at 754. Moodsters Co. has pled these facts, ER99-100 ¶¶131-136, and that alone should suffice under Rule 8.[6]

Moodsters Co.'s Amended Complaint also satisfies a plausibility analysis under *Towle*'s three-prong analysis. On a Rule 12(b)(6) motion, this Court presumes all facts alleged in the Complaint to be true, and draws all reasonable inferences in Moodsters Co.'s favor. *United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 930 (9th Cir. 2013). The district court and this Court also cannot decide facts because "any weighing of the evidence is

---

[6] Disney itself has enforced its character copyrights, arguing for a much lower standard than here, and the district court denied summary judgment based on Disney's registrations alone. *See Disney Enters. v. Sarelli*, No. 16 Civ. 2340 (GBD), 2018 U.S. Dist. LEXIS 137429, at *45 (S.D.N.Y. Aug. 9, 2018) (finding registrations alone satisfied first of two elements of copyright infringement action: "ownership of a valid copyright"); *id.* at *4 ("Plaintiffs claim intellectual property rights with respect to these characters …").

inappropriate on a 12(b)(6) motion." *Jones v. Johnson*, 781 F.2d 769, 771 n.1 (9th Cir. 1986), *overruled as to a different part by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). Courts should not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gilligan*, 108 F.3d at 248 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)). The District Court erred in its application of this standard and its analysis of Moodsters Co.'s Amended Complaint.

### 1. The Amended Complaint pled a plausible claim that The Moodsters ensemble satisfies the *Towle* standard.

Moodsters Co.'s Amended Complaint describes a plausible claim that The Moodsters characters meet—and exceed—the three-element standard for copyright protection. First, Moodsters Co. has alleged, and neither the district court nor Disney has disputed, that the characters have physical as well as conceptual qualities because the characters "appeared graphically." *Towle*, 802 F.3d at 1021; ER101 ¶142; ER3 ("The parties agreed that the first element of the test was met"). As explained below, Moodster Co.'s allegations also demonstrated that The Moodsters characters were sufficiently delineated and were especially distinctive, the second and third prongs of the *Towle* standard.

### a. The Moodsters are sufficiently delineated.

Moodsters Co. plausibly allege that the characters are "'sufficiently delineated' to be recognizable as the same character[s] whenever [they] appear." *Towle*, 802 F.3d at 1021. The Amended Complaint, for instance, identifies these traits and attributes:

> a collection of five anthropomorphic animated characters;

> each character designated by a single emotion, and those emotions being happiness, sadness, anger, fear, and love;

> each character designated by a core body color, with those colors being yellow, blue, red, green, and pink;

> each character represented by a single emotion is paired with a single color, including yellow and happiness, blue and sadness, red and anger, green and fear, and pink and love;

> the collection of characters generally interact as a cohesive group together;

> the characters are not human but have traits and characteristics of human, are not androgynous, and are not animals or objects;

> this ensemble of characters reside inside a child ….

ER101 ¶143. The Amended Complaint also sets forth additional expressive traits and attributes of each individual character. ER81-155 ¶¶52-59, 198-333. Moodsters Co. also alleged that, "[b]ased on the expression of these traits and attributes[,] and as they are depicted

graphically, the ensemble of Moodsters characters is recognized whenever they appear." ER101 ¶143.

The Amended Complaint shows the extensive investment and work that went into developing and delineating The Moodsters, and previous recognition of the well-delineated characters. ER101-103 ¶¶145-154. The Amended Complaint outlines the $3.3 million invested in Moodsters Co. to develop these characters and a market for them. *Id.* ¶¶145-147. Additionally, leading professors at Yale University conducted focus groups across socioeconomic backgrounds. This testing provides objective evidence of *The Moodsters* characters' delineation, as the focus groups confirmed that children understood, recognized, and enjoyed the characters. *Id.* ¶¶148-149. Two leading emotion intelligence experts, along with leading entertainment companies, lauded the characters as well. *Id.* ¶¶150-153. None of the entertainment companies, including Disney, expressed any concern about lack of detail. *Id.* ¶154. All these facts support the reasonable inference that *The Moodsters* characters—made up from their unique combination of traits above—are sufficiently delineated.

This Court should not expect more from Moodsters Co. at the pleadings stage. At a minimum, Moodsters Co. should have the opportunity to prepare its case with evidence. Moodsters Co.'s briefing below, and Amended

Complaint, even stated that a leading professor of animation history would, if given the opportunity, present testimony explaining how *The Moodsters* characters exhibit agency to engage and drive a narrative. ER103-104 ¶155, ER298-307, ER338-344.[7]

But the district court disregarded the potential role for expert testimony on this fact-intensive issue. *See generally* ER1-20. Instead, the district court decided copyrightability by itself in a vacuum without a proper record. In doing so, the district court ignored the Supreme Court's warning that "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903).[8] Even more problematic, the district court provides only a conclusory analysis of Moodsters Co.'s character ensemble

---

[7] Professor Maureen Furniss is a leading animation historian at CalArts with experience teaching at USC—the top two animation programs in the country. She has published several books: *A New History of Animation*; *The Animation Bible: A Practical Guide to the Art of Animating, from Flipbooks to Flash; Animation: Art and Industry (Editor)*; and *Art in Motion: Animation Aesthetics*, among many other journal publications. ER298-307.

[8] *See also Cheffins v. Stewart*, 825 F.3d 588, 599 (9th Cir. 2016) ("To be sure, judicial attempts to categorize artistic creations are fraught with difficulties.") (McKeown, J., concurring); *see also Pivot Point Int'l Inc. v. Charles Prods., Inc.*, 372 F.3d 913, 924 (7th Cir. 2004) (stating that "a qualitative evaluation of artistic endeavors" is "a function for which judicial office is hardly a qualifier").

claim before dismissing it. ER8. The District Court did not assess the detailed traits alleged in the Amended Complaint—individually or collectively—before it made its improper fact-findings and conclusions of law on Disney's Rule 12 motion. *Compare id. with* ER72-159 *e.g.* ¶143.

### b. The Moodsters are especially distinctive.

The Amended Complaint also alleges a plausible claim that *The Moodsters* characters are "especially distinctive" and "contain[] unique elements of expression." *Towle*, 802 F.3d at 1022. For this element, case law focuses on whether characters are "stock characters." *See, e.g.*, *id.* at 1021, 1022 (explaining that the character "cannot be a stock character" and finding the Batmobile "is not merely a stock character"); *Rice*, 330 F.3d at 1175 (rejecting claim that magician in standard garb differed "from an ordinary magician").[9] The district court framed this standard relatedly, asking whether characters are "especially distinctive vis-à-vis *other characters*, outside of the work in which they appear." ER18.

---

[9] Other courts focus on differentiating stock characters as well. *See, e.g., Paramount Pictures Corp. v. Axanar Prods.*, No. 2:15-CV-09938-RGK-E, 2017 U.S. Dist. LEXIS 19670, at *11-12 (C.D. Cal. Jan. 3, 2017) (affording copyright protection because character's identify "sets him apart from a stock spaceship officer"); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1127, 1136 (W.D. Wash. 2007) (finding anthropomorphized seagull copyrighted because "[h]e is not a stock character"); *Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) (explaining that character with specific name and specific appearance was not a stock character).

The Moodsters are *not* stock characters. *See* ER106-108 ¶¶159-164. The Amended Complaint provides an overview of earlier works that fail to resemble the novel, unique, and original attributes of five-single emotion characters like The Moodsters. ER93-112 ¶¶96-105, 164, 179-182. Even Disney, perhaps the longest-operating and most prolific animation company ever, has never offered such a work. *Id.* ¶¶96-105, 179-180. Disney's Pete Docter conceded as much. ER89 ¶¶75-76. In fact, single-emotion characters clash with Disney's longstanding focus on multi-dimensional approach. ER94 ¶104. A leading professor of animation history, Professor Furniss, agrees as well that The Moodsters are unique and original. ER108-109 ¶¶ 164-165; ER338-344. The Amended Complaint even provides the historical role of stock characters in animated films to explain why The Moodsters do not fit that category. ER106-108 ¶¶159-164. Indeed, the Amended Complaint outlines many alternatives for expressing the idea of single-emotion characters that do not embody the distinct traits of The Moodsters. ER110-116 ¶¶178-192.

These allegations present a plausible claim, and Moodsters Co. should at least have its day in Court. The district court erred in concluding otherwise, especially as it addressed none of these detailed allegations in its verdict that The Moodsters were not distinctive. *See* ER8.

### c. Courts have recognized that an ensemble of characters may be protected.

The district court's decision is unclear whether it found ensembles of characters unprotectible as a matter of law. *See* ER8-9, ER19. That said, cases often have protected ensembles of characters. The Rocky characters are protected "as a group." *Anderson v. Stallone*, 11 U.S.P.Q.2d 1161, 1166 (C.D. Cal. 1989). The district court recognized on summary judgment that collections of fictional specie groups in Stark Trek may qualify as well. *Paramount*, 2017 U.S. Dist. LEXIS 19670, at *12-13. Disney (along with its affiliate Marvel) has also enforced its copyrights in the ensemble of the Three Little Pigs and the super heroes known as the Avengers. *See Air Pirates*, 581 F.2d at 753-55 n.5; ER345; *Sarelli*, 2018 U.S. Dist. LEXIS 137429, at *4. And even if individual characters are not protected, black letter copyright law provides that the "[o]riginal selection, coordination, and arrangement of unprotectible elements may be protectible expression." *L.A. Printex Indus., Inc. v. Aeropostale*, 676 F.3d 841, 849 (9th Cir. 2012); *see also* ER19. Nor is there case law that precludes protection for an ensemble of characters.

### 2. The Amended Complaint pled a plausible claim that each individual Moodsters character is a copyrighted character.

Moodsters Co. also states plausible claims that each individual character is copyrighted. *See* ER72-295, *e.g.* ¶¶198-223, 235-260, 271-297, 309-333.

Neither Disney nor the district court addressed each character individually in their motions and orders, respectively. *See generally* ER1-20. Moodsters Co., thus, sets forth below how the Amended Complaint describes a plausible claim that the Anger character is copyrighted, as representative of its allegations for the remaining individual characters and otherwise rests on the detailed allegations for those counts.

Like the ensemble above, Disney and the district court concede that each individual Moodsters character has physical and conceptual characteristics, and thus satisfies the first element. ER3-4.

### a. The Anger character is sufficiently delineated.

The Anger character is sufficiently delineated as well. The Amended Complaint, for instance, identifies these traits and attributes:

> the Anger character is an anthropomorphic animated character represented by the single emotion of anger;
>
> the application of red as the Anger character's core body color;
>
> the tendency to literally explode from the head when most angry;
>
> the role the Anger character maintains within the ensemble of four other characters …;
>
> that the Anger character is not human but has traits and characteristics of humans, is not androgynous, and is not an animal or object;

that the Anger character resides inside a child, along with the other four characters represented by a single emotion and a core body color.

ER139-140 ¶279.

Perhaps most expressive, the Anger character explodes from the head when most angry. *Id.*; ER85-86 ¶56. These traits delineate the Anger character as recognizable whenever the character appears. Again, Professor Furniss agrees too. ER142 ¶289. Moodsters Co. refined each character, including the Anger character, including through work of experts working for Moodsters Co. to include specific facial expressions and dialogue reflecting the experts' interpretation of how to express or reflect certain scientific research on the emotion. ER141 ¶283; *see also* ER102 ¶147. And the focus group testing for the Moodsters Co. confirmed that diverse audiences liked the Anger character as delineated in the Pilot. ER141 ¶¶284-285.

### b. The Anger character is especially distinctive.

Moodsters Co. described how and why the Anger character is not a stock character in the Amended Complaint. ER143-146 ¶¶292-297. Unlike the generic magician in *Rice*, the Amended Complaint explains that no such character with the traits and attributes of the Anger character in *The Moodsters* existed before. *Id.* ¶¶296-297. The large body of animated works before *The Moodsters* fails to show generic or stereotypical single-emotion angry characters

that are red and explode from the head. *See id.* The Anger character is not a generic "hot-head" as Disney argued below. Donald Duck, for instance, has a temper. But he is not red. He does not represent the single emotion of anger, or maintain a role with other single-emotion characters. And he does not explode from the head when angry.[10] Again, Professor Furniss agrees that The Moodsters Anger character, like the other individual Moodsters characters referred to in the Amended Complaint, is original and distinctive from other previous animated characters. ER145-146 ¶¶296-297; *see also* ER124-125, ER135, ER155. Even then, if Disney disagrees, then the parties should submit competing evidence on a proper record. Moodsters Co.'s allegations set forth a plausible claim that the Anger character is protected.

## C. The district court made several legal errors in misapplying the test for character copyrights and violated fundamental aspects of copyright law.

### 1. The district court erred by deciding fact issues contrary to the allegations in the complaint.

The District Court erred by making conclusory findings without proper deference to factual allegations presumed true and not drawing reasonable inferences in Moodsters Co's favor. ER5-9. This alone, based on de novo review, is sufficient for this Court to reverse and remand.

---

[10] The same is true for human characters known for angry outbursts, like Walter from *The Big Lebowski* or George Costanza from *Seinfeld*.

The dismissal was contrary to *Halicki* and *Halicki II*. In both decisions, this Court and the district court looked at thematic and abstract qualities to determine copyrightability. This Court found a fact issue over Eleanor's "consistent, widely identifiable traits" based solely on the car's role in the thematic storyline of *Gone in 60 Seconds*. *Halicki*, 547 F.3d at 1225 ("the thefts of the other cars go largely as planned, but whenever the main human character tries to steal Eleanor, circumstances invariably become complicated"). Likewise on remand, the district court confirmed that a fact issue existed "as to whether 'Eleanor' is 'sufficiently delineated'" because of Eleanor's role in the "central theme" as a "unicorn" for the main character in the movie, and intangible qualities like Eleanor's portrayal as "sensitive and temperamental," and her "strength, talent, and endurance." *Halicki II* at 14-15 (ER39-40).

None of these thematic and intangible qualities place Eleanor in the echelon of "iconic" characters that the District Court here required for character copyrights. Even so, this Court found a fact issue on a full summary judgment record, and the district court found that a jury must resolve fact disputes over these traits. The Moodsters are far more concrete and detailed characters than the car in *Halicki*. And the only question now is whether Moodsters Co. alleged a plausible claim, not even a triable claim, like in *Halicki*.

### 2. The district court erred by making copyright protection dependent on a showing of fame or amount of distribution.

The district court applied a heightened standard for copyright protection that does not exist. The District Court applied a "rigorous" standard that required The Moodsters characters to match characteristics of "those of the iconic characters … such as Sherlock Holmes, Tarzan, Superman, and James Bond … who are 'instantly recognizable as the same character[s] whenever they appear.'" ER3. It focused on the limited distribution of *The Moodsters* to deny protection. ER3-4; ER17-18.

Copyright law protects famous characters like Batman, Godzilla, and Tarzan. *Sapon v. DC Comics,* 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002) (Batman); *Toho Co., Ltd. v. William Morrow & Co.,* 33 F. Supp. 2d 1206 (C.D. Cal. 1998) (Godzilla); *Edgar Rice Burroughs, Inc. v. Manns Theatres*, 195 U.S.P.Q. 159 (C.D. Cal. 1976) (Tarzan). But courts within and outside this Circuit protect lesser known characters as well. "Jim Brockmire," a fictitious broadcaster, from a 4-minute online skit from 2010 is protected. *Azaria v. Bierko*, No. CV 12-9732 GAF, 2014 U.S. Dist. LEXIS 190372, at *13 (C.D. Cal. Feb. 21, 2014).[11] An anthropomorphic seagull is a copyrighted character. *Bach*, 473 F. Supp. 2d at

---

[11] The online skit is available at
https://www.youtube.com/watch?v=M95P3DTYxqg.

1135-36. So is "Bill," a dollar-bill costumed character featured in several banking videos. *JB Oxford & Co. v. First Tenn. Bank Nat'l Ass'n*, 427 F. Supp. 2d 784, 799 (M.D. Tenn. 2006) ("While Bill is perhaps not as distinctive as Superman, Godzilla, James Bond or Rocky, he is certainly more distinctive than the 'Magic Magician' in *Rice*."). And a comic book character "Count Cogliostro" is protected too. *Gaiman*, 360 F.3d at 661.[12]

This Court has never characterized the legal standard as such a "rigorous" one. Perhaps the district court's confusion stems from the same issue Disney addressed decades ago in *Air Pirates*: "It is *fundamental to recognize* the difference between literary and cartoon characters . . . A failure to recognize such basic differences results in the kind of *confused* and *inconsistent* case analysis reflected in Appellant's Brief." ER349-350 (emphasis added). Courts have since recognized this distinction: While "*literary* characters are entitled to somewhat limited copyright protection," "*far greater* protection has been afforded *cartoon* characters." *Fleischer Studios, Inc. v. A.V.E.L.A. Inc.*, 772 F. Supp. 2d 1135, 1144 (C.D. Cal. 2008) (emphasis added), *aff'd* 654 F.3d 958, 962 (9th Cir. 2011) ("There is no doubt that a separate Betty Boop character copyright exists."). Whatever the basis for its conclusion, the district court

---

[12] Professor Nimmer has even concluded that "Cheeta"—the ape in Tarzan—is copyrighted. 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.12[A][3][b] n.50 (2017) (citing *Burroughs*, 195 U.S.P.Q. 159).

erred when it applied a heightened, "rigorous" standard to The Moodsters animated characters.

The fundamental policy of copyright law does not support the district court's heightened standard either. Originality is the touchstone of copyright protection. *Feist*, 499 U.S. at 347. And the originality necessary for copyright is "extremely low," calling only for "independent creation, not novelty." *Id.* at 345; *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 (9th Cir. 1970). The district court's dismissal of Moodsters Co.'s copyright claims are incompatible with this building block of copyright law. It would be unusual, to be sure, if copyright law—a form of intellectual property designed to promote creativity—protects the yellow pages and price lists, *see Feist*, 499 U.S. at 361; *CDN Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999), but not the unique and concrete expression of five-single emotion characters.

Even though Moodsters Co. has asserted in detail that these characters are novel, courts do not require such a standard. For instance, the court did not analyze whether Eleanor was the first "unicorn" object pursued by a human character. *See Halicki II* at 14 (ER39). James Bond was certainly not the first character with "overt sexuality." *See Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.,* 900 F. Supp. 1287, 1296 (C.D. Cal. 1995). And this Court did not analyze whether the Batmobile was the first vehicle with "up-to-date weaponry

and technology." *See Towle*, 802 F.3d at 1022. The district court's analysis here neither comports with the building blocks of copyright law nor fits within the contours of other character copyright decisions.

Nor does a character's fame determine copyrightability. Many characters that have been found protected would not qualify for copyright protection if it did. This Court's reference to the limited distribution in *Rice* does not hold otherwise. 330 F.3d at 1175. The holding in *Rice* is that characters with only "generic and common" attributes, like a stock magician in "standard magician garb," are not protected. *Id.* at 1175-76. Other district court cases since *Rice* have not interpreted it as creating a litmus test for distribution either. *See, e.g., Bach*, 473 F. Supp. 2d at 1136 ("the fact that his character has not been delineated over time is inconsequential"); *Azaria*, 2014 U.S. Dist. LEXIS 190372, at *6-7, *11-13 (finding character in short online video copyrighted, noting that "[t]he only fixation of the Jim Brockmire character took place in the video described above"). At a minimum, this case presents the opportunity to clarify whether some number of future distributions is necessary for the underlying character to qualify for copyright protection in the first instance.

No such test should exist for two main reasons. First, copyright law should apply to all artists equally, and not favor large corporate empires like Disney. Indeed, copyright law protects individual artists and small companies,

like Daniels and Moodsters Co., without the means to distribute broadly and promote their work themselves: "The limited monopoly granted to the artist is intended to provide the necessary bargaining capital to garner a fair price for the value of the works passing into public use." *Stewart v. Abend*, 495 U.S. 207, 229 (1990).[13] But a test requiring mass distribution and fame before allowing copyright protection, like that the district court employed, will benefit only large companies with the means to do so. Copyright law cannot allow Disney to copy original characters that artists, like Moodsters Co., pitch to them simply because the artists lack the means to publicize widely their characters. Second, as detailed below, it conflicts with fundamental copyright law that protection begins at creation.

### a. The district court erred by focusing on events occurring after The Moodsters were reduced to a fixed medium to determine copyrightability.

The district court's analysis conflicts with basic elements of copyright law. An artist obtains a copyright when she expresses her original idea in a fixed medium. 17 U.S.C. § 302(a); 17 U.S.C. § 101; *Vigil v. Walt Disney Co.*, No. C-95-1790-MHP, 1995 U.S. Dist. LEXIS 15560, at *9 (N.D. Cal. Oct. 16, 1995) ("Copyright protection pursuant to 17 U.S.C. §§ 101-1101 begins as soon

---

[13] *See also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.").

as a copyrightable expression is reduced to tangible form"). The question for character copyrights, thus, is when an original character was *first* expressed in a fixed medium. *See also supra*, p. 41 (citing *Bach*, 473 F. Supp. 2d at 1136; *Azaria*, 2014 U.S. Dist. LEXIS 190372, at *6-7, *11-13). The district court, thus, erred by focusing on events arising after Moodsters Co. reduced the characters to a fixed medium—both in the bible and pilot episode—like the extent of distributions of *The Moodsters* bible and pilot, and persistence "over time or over multiple iterations." ER17.

Copyright law does not require a character to appear "over multiple iterations" for copyright eligibility. A character's second iteration is a derivative work. And a derivative work is "independent of, and does not affect or enlarge the scope . . . of, any copyright protection in the preexisting material." 17 U.S.C. § 103(b). Whether Batman, James Bond, or The Moodsters, later versions of these characters cannot affect the determination of the copyrightability of the character as fixed in the earlier work.

Vague and uncertain intellectual property rights harm both owners and the public. But a test that focuses on after-fixation events, and some vague amount of fame, will not provide that clarity. The artist will not know when her work is protected. Nor will the public know what is in the public domain and what infringes. This uncertainty reinforces that this Court should apply the

plain language in the copyright statute that the existence of a copyright begins when the artist reduces the work to a fixed medium. The district court's analysis linking copyright protectability to some after-fixation degree of fame and distribution should be rejected as legal error.

### b. If after-fixation events matter, then the district court erred by disregarding the allegations regarding the second generation of The Moodsters.

The district court's dismissal still requires reversal even if this Court looks at events arising after creation of The Moodsters. The Amended Complaint provides an overview of the successful continuation of The Moodsters characters in a second generation. ER104-106 ¶¶156-158. Retail stores and websites sell The Moodsters toys and books across the country. *Id.* ¶156. International media outlets and organizations—like MSN.com, *The Huffington Post*, The Today Show, among others—have featured The Moodsters as well. *Id.* ¶157. And The Moodsters have won many prestigious awards too. *Id.* While the second generation Moodsters evolved with a more modern design, all versions of The Moodsters maintain the same core characteristics and traits that made them so unique in the first place. *Id.* ¶158; *see also* ER122-153 ¶¶217, 254, 291, 327.

The district court gave no weight to this second generation of The Moodsters, ER5-6, even though it required Moodsters Co. to show traits

"persistent enough, over time or over multiple iterations." ER4, ER17. The district court's analysis suffers from three material flaws. First, the district court conducted an improper factual analysis, remarking about its perception of "alien- or insect-like appearance," arm length, and what it calls "teddy-bear-like shape," among other of its personal impressions of The Moodsters. ER5. The district court concluded that it was "unpersuaded" about whether the two generations are "widely" or "instantly" recognizable as the same characters. ER6.

But Moodsters Co. had no burden to persuade the district court of any facts at this stage. The district court needed to assume all facts in the Amended Complaint true, and also "draw inferences in the light most favorable to the plaintiff" Moodsters Co. *Barker v. Riverside County Office of Educ.*, 581 F.3d 821, 824 (9th Cir. 2009) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Instead, the district court went out of its way to draw inferences in Disney's favor, and make factual findings that at least deserve a full record, not to mention a jury. Even more problematic, the district court ignored the detailed features that Moodsters Co.'s pled in its Amended Complaint, and instead focused on perceived differences in appearance. *Cf.* ER5 *with* ER72-159 *e.g.* ¶¶158, 217, 254, 291, 327; *see also Towle*, 802 F.3d at 1021 ("Considering the character as it has appeared in different productions, it must display consistent, identifiable

character traits and attributes, although the character *need not have a consistent appearance*.") (emphasis added).

Second, the district court failed to apply the established law on character copyrights. This Court has recognized minor—sometimes even major— differences among physical appearance details in character iterations are irrelevant. *See, e.g., Towle*, 802 F.3d at 1022 (recognizing dramatic differences in batmobile versions did not prevent copyrightability); *id.* at 1020 ("As indicated in *Halicki*, a character may be protectable if it has distinct character traits and attributes, even if the character does not maintain the same physical appearance in every context."); *Halicki*, 547 F.3d at 1217-18, 1225 (different year, make, and model for inanimate car did not preclude copyrightability of character); *see also Metro-Goldwyn-Mayer,* 900 F. Supp. at 1296 (finding James Bond could be copyright-protected character despite his appearance "has changed enormously from film to film, from actor to actor, and from year to year"); *Sapon*, 62 U.S.P.Q.2d at 1694 (finding Batman protected even though "Batman's costume and character have evolved over the years"). Moodsters Co. submits that the physical appearance changes in the later generations of *The Moodsters* characters are no more different from those in Batman, James Bond, and Eleanor, as addressed in earlier cases.



ER64-65, ER147. At a minimum, the trier of fact should resolve this issue on a proper record; not the district court on the pleadings.

Third, the district court decided that even if the second generation were relevant, "it would not have retroactive effect to make the 'first generation' characters independently protectable *at the time of the alleged copying*." ER6 (emphasis in original). The district court cited no authority for this statement, and notes only that a derivative work does not enlarge the scope of preexisting material. *Id.* (quoting 17 U.S.C. § 103(b)). But this citation merely reinforces Moodsters Co.'s position that the scope of its preexisting copyright in The Moodsters was not diminished by whatever copyright protection might also separately exist in the derivative works involving the same characters. *See* Section I.C.2.a, above.

But even if the district court were correct, copyright infringement is a continuing tort. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1969 (2014) ("Each time an infringing work is reproduced or distributed, the infringer commits a new wrong."). Disney continues to infringe to this day— well after the second-generation of The Moodsters. *See generally* 17 U.S.C. §§ 501, 504. Neither the district court nor Disney ever addressed that issue.

**D.    The "story being told" test confirms a plausible claim.**

The district court also erred in its refusal to consider the "story being told" test. As noted above, this Court held that a character could be copyrighted if it "constitutes the story being told." *Warner Bros.*, 216 F.2d at

950. Cases since *Warner Bros* have refined an "especially distinctive" test, culminating recently in *Towle*. But no case has overruled the "story being told" test. Even so, the district court chose not to consider it. ER9.

Moodsters Co. submits that "the story being told test" remains relevant for two reasons. First, the test remains valid until this Court overrules it. *See, e.g.*, *In re Osborne,* 76 F.3d 306, 309 (9th Cir. 1996). The district court erred, thus, in not considering whether Moodsters Co.'s Amended Complaint sets forth a plausible claim under what this Court has stated is an alternative standard.[14] *Rice*, 330 F.3d at 1175 ("characters that are 'especially distinctive' *or* the 'story being told' receive protection apart from the copyrighted work") (emphasis added); ER109 ¶¶166-167.  Second, even if this Court eliminates the "story being told" test now, that Moodsters Co. states a plausible claim under this heightened standard confirms that the district court misapplied the more lenient standard in *Towle*.

## II. The district court erred when it dismissed Daniels' breach of implied-contract claim.

### A. The district court resolved inferences against Daniels based on its interpretation of copyright records.

The district court dismissed Daniels' *Desny* claim based on inferences it drew in Disney's favor about her 2005 copyright registration. ER15.

---

[14] Nor did Disney even respond to the merits of Moodsters Co.'s allegations. *See* ER71 at n.3; ER70.

"Publication" is a legal term of art in copyright law that includes "offering to distribute copies or phonorecords to a group of persons *for purposes of further distribution* []." 17 U.S.C. §101 (emphasis added). In 2005, Daniels distributed copies of *The Moodsters* bible to Disney, among other companies like Nickelodeon, in hopes of collaborating with one of these companies for further distribution of The Moodsters. ER81-88 ¶¶48, 60-65. Daniels, thus, listed on the copyright registration that *The Moodsters* bible had published in 2005. *See id.*, ER323-324, ER15.

The district court disregarded the circumstances of Daniels' disclosure to Disney or the reason for designating the bible as published. Instead, the district court latched onto a legislative history record from 1976, and specifically a quote buried on page 138. As noted in that old text, "A work is 'published' if it is distributed with 'no explicit or implicit restrictions with respect to [the] disclosure of [the] contents' of the work." ER15 (quoting H.R. Rep. No. 94-1476 at 138 (1976)). The district court then concluded that the 2005 "publication" alone disposed of Daniels' *Desny* claim, and denied leave to amend her complaint. *Id.*; ER20.

This decision suffers from two main flaws. First, the district court refused to draw reasonable inferences in Daniels' favor. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (reversing district court for not

construing "allegations in the light most favorable to plaintiffs"). Daniels pled that she disclosed *The Moodsters* bible to Disney in 2005. And she did so for the purpose of further distribution to a wider audience. *See* ER81-88 ¶¶ 48, 60-61, 65. None of these facts is inconsistent with her disclosure of her idea in exchange for compensation if Disney later chose to distribute it. The district court, thus, erred through its inference that Daniels' distributed her works herself to the public more broadly.

Second, the district court had no basis to conclude that *The Moodsters* "was freely available" when Daniels contacted Disney. To begin, the district court ignored that the basis for publication included Daniels' "pitch" disclosure *to Disney*. *See* ER81-88 ¶¶ 48, 60-61, 65; ER323-324. "Publication" by itself does not establish unconditional public disclosure or public availability. *See, e.g., Dolman v. Agee*, 157 F.3d 708, 714 (9th Cir. 1998) (explaining that copyright publication dates "do not, however, prove that the movies were 'published,'" in the sense of "inject[ion] into the public domain"). And even if it did, the district court was not permitted to find, without allowing rebuttal evidence in further proceedings, that the registration form correctly listed the publication date as a factual matter. *See id.* at 714; *see also J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 440 (9th Cir. 2010) (explaining even if "the *existence* of a document may be judicially noticeable, the truth of

statements contained in the document … *are not subject to judicial notice*")
(emphasis in original). At a minimum, Daniels deserved an opportunity to
address this issue as a factual matter.

### B. The district court erred because the consideration for a *Desny* contract is the service of conveying an idea unknown to the recipient, even though others may know about the idea.

The district court also erred because Daniels could plead a plausible
*Desny* claim even if some people other than Disney knew of her idea.
California courts have long recognized that ideas are "as free as the air." *Desny
v. Wilder*, 299 P.2d 257, 265 (Cal. 1956). Even so, "the *services* of *conveying* the
idea" may serve as valid consideration for an implied contract. *See, e.g.,
Donahue v. Ziv. Television Programs, Inc.*, 54 Cal. Rptr. 130, 140 (Cal. Ct. App.
1966) (emphasis added); *see also Desny*, 299 P.2d at 266. Indeed, "the bargain is
not for the idea itself, but for the services of conveying that idea." *Grosso v.
Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004).

An idea need not be novel to serve as consideration. "It is settled law in
California that novelty is not required for an implied-in-fact contract claim
arising out of unauthorized use." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d
620, 629 (9th Cir. 2010) (citing *Desny*, 299 P.2d at 266)); *Chandler v. Roach*, 319
P.2d 776, 780-82 (Cal. Ct. App. 1957)). Nor does the idea need to be
confidential. "While the idea disclosed may be common *or even open to public*

52

*knowledge*, yet such disclosure if protected by contract, is sufficient

consideration for the promise to pay." *Weitzenkorn v. Lesser*, 256 P.2d 947, 957

(Cal. 1953) (en banc) (emphasis added). The key is that the idea is unknown by

the receiving party:

> Even though the idea disclosed may be widely known and generally understood, it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty. An implied-in-fact contract differs from an express contract only in that the promise is not expressed in language but implied from the promisor's conduct.
>
> We believe that if a producer obligates himself to pay for the disclosure of an idea, *whether* it is *protectible or unprotectible* material, in return for a disclosure thereof he should be compelled to hold to his promise.

*Chandler*, 319 P.2d at 781 (emphasis added; internal quotations omitted); *see*

*also West v. Ebay, Inc.,* No. 1:17-cv-285, 2017 U.S. Dist. LEXIS 197786

(N.D.N.Y. Dec. 1, 2017) (denying motion to dismiss breach of contract and

other claims because idea disclosed by plaintiff to defendant was adequate

consideration as complaint implied it was unknown to defendant even if the

idea was publicly available or known to some members of the public). The key

thus is whether *the receiving party* knew of the idea before the disclosure, not

whether anyone else knew of the idea at that time.

Daniels pled a plausible claim based on these considerations. ER72-159

*e.g.* ¶¶6-9, 75-76, 94-105, 164, 179-180, 111-121. Indeed, Disney had never

before developed characters similar to Daniels' idea. *Id.* ¶¶75-76, 94-105, 164, 179-180. Disney had every incentive to receive Daniels' idea because Disney was unaware of it.

Yet the district court based its decision on a single unpublished district court decision. ER14-15. The district court held that no implied contract claim can arise after any public disclosure of an idea because there can be "no implied promise to pay for freely available ideas." *Id.* (citing *Quirk v. Sony Pictures Entm't, Inc.*, No. C11-3773, 2013 U.S. Dist. LEXIS 47954, at *33 (N.D. Cal. Apr. 2, 2013)). But that legal conclusion conflicts with the law and logic summarized above underlying *Desny* claims. This Court has explained "that a writer and producer form an implied contract under circumstances where both understand that the writer is disclosing his idea on the condition that he will be compensated if it is used." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (citing *Desny*, 299 P.2d at 270). The district court's reliance on *Quirk* adds elements to a *Desny* claim that do not exist, and in essence converts that claim into a breach of confidence claim. *Cf. Green v. Schwarzenegger*, No. CV 93-5893-WMB, 1995 U.S. Dist. LEXIS 14031, at *16 (C.D. Cal. July 11, 1995) (listing elements for breach of confidence claim).

Nor is *Quirk* persuasive. The portion that the district court relies on is *dicta*. The defendants in *Quirk* prevailed because the plaintiff had no evidence

that any of plaintiff's ideas were ever disclosed to the defendants under circumstances that could support a bilateral expectation of payment. 2013 U.S. Dist. LEXIS 47954, at *28-31. The plaintiff could only offer "sheer speculation" about how defendants might have obtained his ideas, and had admitted if defendants obtained his novel from the open market he had no viable *Desny* claim. *Id.* at *31, *33. The *Desny* claim in *Quirk* thus failed to prove the "essence" of the claim: disclosure of the idea under circumstances showing "an expectation on both sides that use of the idea requires compensation." *Id.* at *27 (quoting *Montz*, 649 F.3d at 976).[15] The court's reference to public availability was not essential to the ruling. Even then, the *Quirk* court recognized that a *Desny* claim may proceed without the plaintiff's "utmost degree of secrecy and confidentiality." 2013 U.S. Dist. LEXIS 47954, at *34.

The district court's analysis of Daniels' *Desny* claim is also in tension with its dismissal of Moodsters Co.'s copyright claims. The district court dismissed the *Desny* claim because the idea was "freely available." ER14. But later in that same order, the court dismissed Moodsters Co.'s copyright claims

---

[15] *Quirk* is also inapplicable for procedural reasons because the district court decided *Quirk* on summary judgment with a full record. 2013 U.S. Dist. LEXIS 47954, at *28-*35. Unlike the district court here, the *Quirk* court denied a motion to dismiss to allow both sides to develop and offer evidence on the disputed issues. *See id.* at*28; *Quirk v. Sony Pictures Entm't, Inc.*, No. C11-3773, 2012 U.S. Dist. LEXIS 107362 (N.D. Cal. July 5, 2012).

because the characters had such limited distribution and thus were not well known. ER17. If anything, the district court's findings on the copyright claim require the reasonable inference that Daniels' idea was unknown to Disney but-for her disclosure to Disney. That supports a plausible *Desny* claim, even if limited other individuals also knew of Daniels' idea.

At a minimum, this issue calls for a proper record, and not the record the district court based its decision on. This Court should reverse the District Court's decision dismissing her claim on the pleadings alone and remand.

## CONCLUSION

Daniels and Moodsters Co. expressed an idea in a way that others had not done before. Copyright law exists to encourage this type of creativity. Daniels and Moodsters Co. deserve the opportunity to present their case on the merits, so a jury may decide whether Disney copied these original characters. This Court should reverse the district court's judgment and remand for further proceedings.

Dated: August 24, 2018       Respectfully submitted,

By: */s/Patrick M. Arenz*
    **ROBINS KAPLAN LLP**
    **Ronald J. Schutz**
    **Patrick M. Arenz**
    **Brenda L. Joly**
    2800 LaSalle Plaza
    800 LaSalle Avenue

Minneapolis, MN 55402-2015
(612) 349-8500

*Attorneys for Plaintiffs-Appellants Denise
Daniels and The Moodsters Company*

## REQUEST FOR ORAL ARGUMENT

Appellants request that this Court hear oral argument.

/s/ Patrick M. Arenz
Patrick M. Arenz
*Counsel for Appellants*

## STATEMENT OF RELATED CASES

Appellants state that they are aware of no related cases pending in this

Court.

/s/ Patrick M. Arenz
Patrick M. Arenz
*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the length limits

permitted by Ninth Circuit Rule 32-1. The brief is 12,167 words, excluding the

portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face

comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ Patrick M. Arenz
Patrick M. Arenz
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Patrick M. Arenz
Patrick M. Arenz
*Counsel for Appellants*

88978511.2