# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

────────────────

Denise Daniels; The Moodsters Company,

*Plaintiffs-Appellants,*

vs.

The Walt Disney Company; Disney Enterprises, Inc.; Disney Consumer Products and Interactive Media Inc.; Disney Interactive Studios, Inc.; Disney Shopping, Inc.; Pixar,

*Defendants-Appellees.*

────────────────

On Appeal From The United States District Court
Central District of California
Honorable Philip S. Gutierrez, District Judge
Case No. 2:17-cv-04527-PSG-SK

────────────────

## APPELLEES' ANSWERING BRIEF
────────────────

MUNGER, TOLLES & OLSON LLP
Glenn D. Pomerantz
Erin J. Cox
Kenneth M. Trujillo-Jamison
Anne K. Conley
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendants-Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Defendants-Appellees Disney Enterprises, Inc., Disney Consumer Products and Interactive Media Inc., Disney Interactive Studios, Inc., Disney Shopping, Inc., and Pixar are all wholly-owned direct or indirect subsidiaries of Defendant-Appellee The Walt Disney Company, a publicly traded company. No publicly-held company owns 10% or more of The Walt Disney Company.

DATED: October 24, 2018          MUNGER, TOLLES & OLSON LLP

By:     */s/ Erin J. Cox*
ERIN J. COX
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS.................................................................................. iii

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT .....................................................................3

ISSUES PRESENTED.....................................................................................3

STATUTORY AUTHORITIES ..........................................................................4

STATEMENT OF THE CASE............................................................................4

   A.   The Parties' Works ............................................................................4

      1.   *The Moodsters*................................................................................4

      2.   *Inside Out* ...................................................................................7

   B.   Proceedings Below............................................................................8

      1.   Original and First Amended Complaint ..............................................8

         (a)   Copyright Infringement Claims .......................................................9

         (b)   Implied-in-Fact Contract Claim.......................................................11

      2.   Second Amended Complaint ..............................................................13

         (a)   "Second Generation" Moodsters ........................................................14

         (b)   Development of *The Moodsters* Pilot ................................................15

         (c)   Dismissal of the Second Amended Complaint ....................................15

SUMMARY OF THE ARGUMENT ....................................................................17

STANDARD OF REVIEW ...............................................................................21

ARGUMENT .................................................................................................21

   A.   The Court Should Affirm Dismissal of the Copyright Infringement Claims Because the Moodsters Characters Are Not Independently Copyrightable. .......21

      1.   The District Court Properly Applied the Three-Part Test Articulated in *Towle* to Evaluate Whether the Moodsters Warrant Independent Copyright Protection as a Matter of Law Based on Undisputed Facts. .............................22

         (a)   *Towle* Consolidated Relevant Precedent to Establish the Governing Standard for Graphically Depicted Characters; The "Story Being Told" Test Is Not Applicable. ..................................................................................23

         (b)   Under *Towle*, a Court May Consider the Persistence of a Character's Attributes in Different Productions.............................................................26

(c) The District Court Did Not Err in Determining Independent Copyrightability as a Matter of Law..............................................................31

2. *The Moodsters* Characters Are Not Independently Copyrightable. ........36

(a) Plaintiffs Have Waived Their Arguments as to Three of the Individual Moodsters Characters..........................................................................36

(b) The Red Moodster Is Not Sufficiently Delineated and Recognizable, Nor Especially Distinctive. ............................................................38

(c) The Second Generation Moodsters Do Not Render the First Generation Especially Distinctive and Recognizable..................................42

3. The Ensemble of Lightly-Sketched Moodsters Characters Is Not Entitled to Independent Copyright Protection. ................................................44

B. The District Court Properly Held that Daniels's Breach of Implied Contract Claim Fails as a Matter of Law Because Daniels Repeatedly, Unconditionally, and Publicly Disclosed Her Idea..........................................................47

1. Daniels's Unconditional Disclosure of Her Idea Prevents Formation of an Implied Contract Under *Desny*. ..............................................48

2. Daniels's 2005 Publication of the *Moodsters* Bible Prevented the Formation of an Implied Contract. ..................................................52

3. Daniels's 2007 Publication of the *Moodsters* Pilot Prevented the Formation of Any Implied Contract, and Excused Performance Under Any Prior Implied Contract. ...................................................................56

4. Daniels's Distribution of the Second Generation Moodsters Products Excused Performance Under Any Prior Implied Contract. ............................57

CONCLUSION ................................................................................59

REQUEST FOR ORAL ARGUMENT ................................................60

STATEMENT OF RELATED CASES ................................................61

CERTIFICATE OF COMPLIANCE...................................................62

CERTIFICATE OF SERVICE ..........................................................63

ADDENDUM ...................................................................................64

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Alexander v. Metro-Goldwyn-Mayer Studios Inc.*,
  2017 WL 5633407 (C.D. Cal. Aug. 14, 2017) ..............................................50, 51

*Alexander v. Murdoch*,
  2011 WL 2802899 (S.D.N.Y. May 27, 2011) .............................................39, 56

*Aliotti v. R. Dakin & Co.*,
  831 F.2d 898 (9th Cir. 1987) ................................................................55

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
  134 S. Ct. 2498 (2014).......................................................................54

*Anderson v. Stallone*,
  1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ......................................................45

*Aramark Facility Servs. v. Serv. Emp. Int'l Union*,
  530 F.3d 817 (9th Cir. 2008) ................................................................37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................32

*Bach v. Forever Living Products U.S., Inc.*,
  473 F. Supp. 2d 1127 (W.D. Wash. 2007) .................................................29, 30

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................18, 22, 31, 32

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ................................................................54

*Comedy III Prods., Inc. v. New Line Cinema*,
  200 F.3d 593 (9th Cir. 2000) ...............................................................30

*Conley v. Gibson*,
  355 U.S. 41 (1957)......................................................................31, 32

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) ................................................................33

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ....................................................................passim

*Direct Technologies, LLC v. Electronic Arts, Inc.*,
   836 F.3d 1059 (9th Cir. 2016) ....................................................................33

*Dolman v. Agee*,
   157 F.3d 708 (9th Cir. 1998) ......................................................................54

*Edgar Rice Burroughs, Inc. v. Manns Theatres*,
   1976 WL 20994 (C.D. Cal. Dec. 20, 1976)................................................30

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
   772 F. Supp. 2d 1135 (C.D. Cal. 2008) ...............................................28, 32

*Fun With Phonics, LLC v. Leapfrog Enters., Inc.*,
   2010 WL 11404474 (C.D. Cal. Sept. 10, 2010) ........................................38

*Funky Films, Inc. v. Time Warner Entm't Co.*,
   462 F.3d 1072 (9th Cir. 2006) ....................................................................23

*Gallagher v. Lions Gate Entm't Inc.*,
   2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ........................................24

*Gilligan v. Jamco Development Corp.*,
   108 F.3d 246 (9th Cir. 1997) ......................................................................31

*Gonzalez v. Planned Parenthood of L.A.*,
   759 F.3d 1112 (9th Cir. 2014) ....................................................................32

*Gulden v. Consolidated World Travel Inc.*,
   2017 WL 3841491 (D. Ariz. Feb. 15, 2017) ..............................................32

*Halicki Films, LLC v. Sanderson Sales & Marketing*,
   547 F.3d 1213 (9th Cir. 2008) .............................................................passim

*Indep. Towers of Wash. v. Wash.*,
   350 F.3d 925 (9th Cir. 2003) ......................................................................37

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................................53

*L.A. Printex Industries, Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012) ........................................................44, 45

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) ..............................................................32

*Mahoney v. Sessions*,
    871 F.3d 873 (9th Cir. 2017) ..............................................................57

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ...............................................................54

*McCormick v. Sony Pictures Entm't*,
    2009 WL 10672263 (C.D. Cal. July 20, 2009).....................................39

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995) ......................................10, 27, 29

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988) ......................................................38, 44

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    134 S. Ct. 1962 (2014).........................................................................44

*Quirk v. Sony Pictures Entertainment, Inc.*,
    2013 WL 1345075 (N.D. Cal. Apr. 2, 2013).......................................50

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ............................................................44

*Smith v. Block*,
    784 F.2d 993 (9th Cir. 1986) ..............................................................58

*Toho Co. v. William Morrow & Co.*,
    33 F. Supp. 2d 1206 (C.D. Cal. 1998) ..........................................27, 29

*UL LLC v. Space Chariot, Inc.*,
    250 F. Supp. 3d 596 (C.D. Cal. 2017) ................................................56

*Warner Brothers Pictures, Inc. v. Columbia Broadcasting
Systems, Inc.*,
    216 F.2d 945 (9th Cir. 1954) ..................................................25, 26, 46

*West v. eBay, Inc.*,
2017 WL 5991749 (N.D.N.Y. Dec. 1, 2017) ....................................................52

*Zella v. E.W. Scripps Co.*,
529 F. Supp. 2d 1124 (C.D. Cal. 2007) ............................................................41

**STATE CASES**

*Bliss v. Cal. Coop. Producers*,
181 P.2d 369 (Cal. 1947) ..................................................................................57

*Chandler v. Roach*,
319 P.2d 776 (Cal. Ct. App. 1957) ...................................................................52

*Desny v. Wilder*,
299 P.2d 257 (Cal. 1956) ...........................................................................passim

*Dorn v. Goetz*,
193 P.2d 121 (Cal. Ct. App. 1948) ...................................................................57

*Faris v. Enberg*,
158 Cal. Rptr. 704 (Ct. App. 1979) ............................................................52, 55

*Thompson v. Cal. Brewing Co.*,
12 Cal. Rptr. 783 (Ct. App. 1961) ....................................................................49

*Weitzenkorn v. Lesser*,
256 P.2d 947 (Cal. 1953) ..................................................................................52

**FEDERAL STATUTES**

17 U.S.C. § 101 ........................................................................................53, 64

**STATE STATUTES**

Cal. Civ. Code § 1550 ...............................................................................49, 56

Cal. Civ. Code § 1689 ......................................................................................57

**FEDERAL RULES**

Fed. R. Civ. P. 52 .............................................................................................36

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976).....................................................................53, 54, 64

U.S. Copyright Office, Supplementary Register's Report on the
   General Revision of the U.S. Copyright Law (H. Comm. Print,
   89th Cong., May 1965) ................................................................................24, 65

**OTHER AUTHORITIES**

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*,
   § 2.12[A][1] (Matthew Bender, Rev. Ed.)..............................................24, 28, 46

# **INTRODUCTION**

Fictional characters are typically considered as a component of a copyrighted work as a whole, and evaluated as such for purposes of a copyright infringement claim. On occasion, a character is so well-developed that the character will merit protection independent of the copyright in the underlying work. But as this Court held in *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015), for a visually depicted character to sustain a copyright infringement claim standing alone, the character must be especially distinctive and sufficiently delineated such that it is recognizable as the same character whenever it appears.

The district court in this case properly applied *Towle* in deciding the threshold question whether Plaintiffs' "Moodsters" characters were protected by copyright independent of the rest of Plaintiffs' works—promotional materials discussing Plaintiffs' concept for an educational television show about emotions, and the pilot episode. The Moodsters fell short of the Ninth Circuit's standard. While Plaintiffs complain that the district court's decision deprived them of their right to a jury on the question of character copyrightability, *Towle* itself expressly rejected the argument "that a jury should decide the question whether the Batmobile displayed unique elements of expression and consistent, widely identifiable traits," commenting that the Court, on a *de novo* review, was "well-equipped to determine whether, as a matter of law, the[] undisputed facts establish

that the Batmobile is an 'especially distinctive' character entitled to copyright protection." *Id.* at 1022–23. The fundamental flaw in Plaintiffs' argument is that they fail to identify any factual dispute regarding their characters which would be relevant under *Towle*.

The generic, stereotypical traits and attributes of each of Plaintiffs' characters—lightly sketched through only short summaries, and the minimal insight into the characters derived from the pilot episode—are neither especially distinctive nor sufficiently delineated, as required under *Towle* for independent copyright protection. Even the characters' names changed from work to work, a total of three times. Plaintiffs contend the district court erred in considering the Moodsters as they appeared in different iterations, never acknowledging *Towle*'s observation that "courts have deemed the *persistence* of a character's traits and attributes to be key to determining whether the character qualifies for copyright protection," and thus, "[c]onsidering the character as it has appeared in different productions, it must display consistent, identifiable character traits and attributes" to be recognizable whenever it appears. *Id.* at 1020–21 (emphasis added). Plaintiffs' appeal amounts to a disagreement with this Court's standard in *Towle*, not the district court's application of it.

Plaintiffs' appeal from dismissal of an implied-in-fact contract claim under *Desny* is also peculiar: The opening brief fails to challenge—or even

acknowledge—one of the grounds on which the district court dismissed the claim. Specifically, Plaintiffs do not dispute that they published the pilot episode for *The Moodsters*, including by posting it on YouTube, and that this destroyed the consideration for any purported implied-in-fact contract claim based on their "idea" of using color-coded, anthropomorphized emotions as characters. Only after the implied contract claim had been dismissed with prejudice based on the unconditioned disclosure of *Moodsters* materials did Plaintiffs' Second Amended Complaint reveal that they had also distributed products featuring the Moodsters, yet another basis supporting dismissal.

The district court's judgment should be affirmed in its entirety.

## JURISDICTIONAL STATEMENT

Defendants-Appellees The Walt Disney Company, Disney Enterprises, Inc., Disney Consumer Products and Interactive Media Inc., Disney Interactive Studios, Inc., Disney Shopping, Inc., and Pixar (collectively, "Defendants") agree with Plaintiffs-Appellants Denise Daniels and The Moodsters Company's (collectively, "Plaintiffs") statement of jurisdiction.

## ISSUES PRESENTED

1. Whether the district court correctly held that the Moodsters characters, either individually or as an ensemble, are not entitled to copyright protection independent of the copyrighted works in which they appear.

2.  Whether the district court correctly held that Daniels's claim for breach of an implied-in-fact contract regarding her "idea" of anthropomorphized, color-coded emotions fails as a matter of law as a result of her unconditioned disclosure of that idea by virtue of publication of the *Moodsters* bible, posting of the *Moodsters* pilot episode to YouTube, and distribution of products featuring the Moodsters characters.

## STATUTORY AUTHORITIES

All relevant statutory and legislative history authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.  The Parties' Works

#### 1.  *The Moodsters*

In 2005, Plaintiffs created a "bible" for *The Moodsters*, a contemplated "animated TV show for preschoolers" designed to increase "their ability to name, identify, explore, and manage feelings."  (ER 181.)  The bible recites that *The Moodsters* "property has already attracted the interest of some potentially powerful licensing partners," including General Mills and Target.  (ER 195.)  The bible itself is dated October 2005, and the copyright registration for the bible states that it was published on November 8, 2005.  (ER 180; SER 87–88.)

The bible introduces each of the anticipated characters with a short description.  (ER 192.)  Each of the five main characters—"Zip

(happy/optimistic)," "Roary (angry)," "Olovia (loving)," "Sniff (sad)," and "Shake (scared)"—are furry creatures, roughly the same size, with protruding eyes, small antennae, and spindly arms, and each is a different color.  (ER 84–87.)  Each is said to feel a range of emotions but is identifiable by a predominant character trait.  For instance, the bible introduces "Zip" as a yellow Moodster whose "predominating emotion is happy"; "he's usually quite optimistic and enthusiastic," but "even Zip needs some help figuring out his own emotions and how to respond properly to them."  (ER 183.)  "Roary" is described as "the most likely Moodster to get frustrated and 'blow her top.'"  (ER 184.)  "Sniff" is "[p]rone to doom and gloom," and is the "melancholy Moodster" who "weeps copiously" and feels "particularly dejected when he's left out of things."  (ER 186.)  "Shake" is a "nervous Nellie—a sort of Moodster Cowardly Lion."  (ER 187.)  He is frightened by everything from "a ghost story" to "a rustling in the bushes."  (*Id.*)

The *Moodsters* bible also gives an overview of the structure of the show: "something happens" that causes a Moodster character to "experience[] a feeling he or she can't identify" and, after an "exploratory process," the Moodster "identifies the feeling and figures out how to deal with it."  (ER 192.)  It lays out a sample show idea, where Sniff feels excluded when his friends get together without him; though he initially thinks he is sad, it turns out that he is actually "very angry" and "lets his anger out, big-time."  (ER 194.)

In 2007, Plaintiffs published the pilot episode for *The Moodsters*, including by posting it to YouTube. (ER 204; SER 85–86, 99–102, 113–15.) All of the scenes in the pilot are set in Moodsterville, a whimsical world with grassy knolls and giant mushrooms. (ER 204.)[1] The 2007 pilot uses different names for the characters than those used in the 2005 bible: Zip, Roary, Olovia, Sniff, and Shake are now known as Zazz, Rizzi, Oola, Snorf, and Scootz.

The pilot consists of a series of situations in which a Moodster character experiences an emotion, identifies it, and works through it. For instance, when Rizzi (née Roary) finds out that her friends were hanging out without her, she has an emotional reaction. The other Moodsters identify the emotion Rizzi is feeling by her behavior: Rizzi slammed a door, stomped her feet, yelled, and furrowed her brow—leading the Moodsters to conclude that Rizzi is angry with them. (*Id.* at 8:46–13:44.) Another character in the pilot ("Moodini," a "cross between the three good fairies in 'Snow White' and the wacky professor in 'Back to the Future'" (ER 188)) commiserates with Rizzi, saying she also feels angry when she gets left out. Together they figure out a way for Rizzi to feel better—to talk to her friends. (ER

---

[1] Citations to ER 204 refer to the *Moodsters* 2007 pilot episode, which was provided to the district court as a manually lodged exhibit. (SER 315–17.) Plaintiffs did not file a motion to provide the Court with a copy of their 2007 pilot, one of the works forming the basis for their claims in this case. Defendants have thus filed a separate motion for leave to transmit a DVD of the 2007 pilot to the Court pursuant to Ninth Circuit Rule 27-14.

204 at 15:00–17:29.)  At the end of the pilot, Rizzi declares, "Hey, I'm not angry anymore, not one bit!"  (*Id.* at 20:40.)

### 2.    *Inside Out*

Pixar began work on its feature motion picture *Inside Out* in 2010.  (ER 89.) Pixar released a synopsis of the story in May 2014, and in the year leading up to *Inside Out*'s nationwide release on June 19, 2015, articles frequently discussed the "distinct color-coded characters" at its heart—Joy, Fear, Sadness, Disgust, and Anger— "a crew of anthropomorphized emotions" belonging to a girl named Riley.  (*See generally* SER 38-80; *see, e.g.,* SER 89–98.)  These emotions reside in Riley's brain and are assigned to "Headquarters," where they variously take command of the instrument panel that controls Riley's thoughts and feelings. (SER 84.)[2]

*Inside Out* follows Riley from birth through the cusp of adolescence, focusing on a particularly difficult period when Riley is 11 years old, after her family uproots from Minnesota and moves to San Francisco for her father's job. Her happy existence is shaken as she struggles to make new friends, process her sense of loss, and deal with tensions at home.  (*Id.*)

_____

[2] Citations to SER 84 refer to the DVD of *Inside Out* that Defendants provided to the district court in a manual lodging (SER 119–20), and that Defendants have moved for leave to transmit to this Court.

After the move, Sadness infects Riley's core memories—golden, happy memories of life in Minnesota—causing them to turn a bluish hue. At a pivotal moment, two parallel narratives begin: the journey of Sadness and Joy as they navigate the depths of Riley's mind to find their way back from Long-Term Memory to Headquarters, and the disintegration of Riley's mental state while Fear, Anger, and Disgust are left in control of her decisions and hatch a plan for her to run away, back to Minnesota. The picture concludes with Riley gaining a more sophisticated appreciation for her emotions. (*Id.*)

## B.   Proceedings Below

### 1.   Original and First Amended Complaint

Plaintiff Denise Daniels ("Daniels") filed this lawsuit on June 19, 2017, exactly two years after the nationwide release of *Inside Out*, asserting a single claim for breach of implied-in-fact contract. (ER 402–17.) Plaintiff The Moodsters Company ("Moodsters Co.") was included in an amended complaint filed on September 20, 2017, which added copyright infringement claims based on the 2005 bible for *The Moodsters* and the pilot from 2007. (ER 351, 376–99.) Plaintiffs did not allege that *Inside Out* infringed either the bible or the pilot when considered as a whole, but rather alleged that *Inside Out* infringed their characters: the "happy" Moodster (known either as Zip or Zazz), the "sad" Moodster (Sniff or Snorf), the "angry" Moodster (Roary or Rizzi), and the "scared" Moodster (Shake

or Scootz), as well as the collective ensemble of the Moodsters, which included the "loving" Moodster (Olovia or Oola).

Daniels's implied-in-fact contract claim was based on the allegation that she or her colleagues had "contacted a number of different individuals at Disney-Pixar about *The Moodsters*," including by providing unspecified "materials about *The Moodsters*," and that she talked on the phone to Pete Docter, the director of *Inside Out*, about "the characters, curriculum, and concept underlying *The Moodsters*." (ER 366–68.) Daniels thus asserted that "Disney-Pixar had access to *The Moodsters* before it started working on the movie *Inside Out* in 2010." (ER 379.)

Defendants moved to dismiss the entirety of Plaintiffs' First Amended Complaint.

### (a) Copyright Infringement Claims

As to the copyright infringement claims, Defendants argued two grounds for dismissal: First, the Moodsters characters were not independently copyrightable separate from the works in which they appeared, and therefore could not sustain a claim for copyright infringement. (SER 15–18, 158-62.) Second, even if the Moodsters were independently copyrightable, they still were not substantially similar to the *Inside Out* characters. (SER 18–27, 162-167.) The *Inside Out* characters and the Moodsters are strikingly different in appearance and, unlike the *Inside Out* characters, the Moodsters are not the literal emotions of a human being.

In any event, any alleged similarities were not protected expression—the *idea* of

anthropomorphizing emotions as animated characters is not protectable expression,

nor is the common cultural association of sadness with the color blue, anger with

the color red, or happiness with the color yellow.  (*Id.*)  Because the district court

found that the Moodsters characters were "not protectable in the first instance,

either independently or as an ensemble," the court determined that it "need not

reach" the question of substantial similarity.  (ER 16.)

On the threshold question of character copyrightability, the district court

noted that "[c]haracters standing alone 'are not ordinarily entitled to copyright

protection,'" and found that the Moodsters failed to qualify for independent

copyright protection under the standard set forth in *DC Comics v. Towle*, 802 F.3d

1012 (9th Cir. 2015).  (ER 16.)  Under that test, a character must "'be 'sufficiently

delineated' to be recognizable as the same character whenever it appears,'" and be

"especially distinctive."  (*Id.* (quoting *Towle*, 802 F.3d at 1020–21).)  The district

court contrasted the Moodsters—lightly sketched characters with stereotypical

traits who had different names in each work in which they appeared—with

"[c]haracters such as Sherlock Holmes, Tarzan, Superman, and James Bond [who]

have been deemed to have 'certain character traits that have been developed over

time, making them instantly recognizable wherever they appear.'"  (ER 17

(quoting *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287,

1296 (C.D. Cal. 1995)).)  The district court also found the ensemble of Moodsters characters was not independently copyrightable, noting that Plaintiffs misread case law to support their arguments.  (ER 19.)

The district court dismissed the copyright infringement claims without prejudice in light of Plaintiffs' request for leave to amend.

### (b)    Implied-in-Fact Contract Claim

As relevant to this appeal, Defendants argued that Daniels's implied-in-fact contract claim failed for two independent reasons:  First, Daniels's unconditional disclosure of her "idea" of color-coded, anthropomorphized emotions through publication of the bible and the pilot precluded the formation of any purported implied-in-fact contract, given that the consideration for such a contract—an undisclosed idea—was destroyed.  (SER 29–31, 168-69.)  Second, the claim was time-barred by a two-year statute of limitations, triggered by the public disclosure of Defendants' alleged "use" of Daniels's idea.  (SER 11-13, 27–29, 167-68.)  Starting more than three years before the lawsuit was filed, a slew of news and entertainment articles about the picture, as well as its trailers, made it abundantly clear that each of *Inside Out*'s five main characters was, in the words of Plaintiffs, "an anthropomorphic, color-coded animated character representing a single

emotion" (ER 369) who lived in the mind of an 11-year-old girl.[3]  Daniels contended that the statute of limitations could not be triggered until the nationwide theatrical release of the entire motion picture.  (SER 148–50.)  The district court found the first issue dispositive, and therefore did not address the statute of limitations.  (ER 14.)

The district court began with the principle that a "plaintiff cannot predicate an implied-in-fact contract claim on a work that was publicly disclosed *before* plaintiff disclosed it to defendant in exchange for payment if it is used."  (*Id.*) According to the copyright registrations filed with the Copyright Office, the bible was published on November 8, 2005, and the pilot was published on June 1, 2007; archived YouTube pages further showed that the pilot had been posted online in 2007.  (ER 15; SER 36, 80-82, 99–102, 113–15.)  The district court concluded that, "[h]aving been unconditionally disclosed both in 2005 and 2007 (with the pilot's copyright registration and posting online), *The Moodsters* work was freely available when Plaintiffs made contact with Disney," and therefore there was no basis for the formation of an implied-in-fact contract between the parties.  (ER 15.) The district court dismissed this claim without leave to amend.  (*Id.*)

---

[3] In support of this argument, Defendants provided more than two hundred judicially noticeable documents dating back to March 2014.  (*See* SER 38–80 (Request for Judicial Notice).)

## 2. Second Amended Complaint

Plaintiffs filed their Second Amended Complaint ("SAC") on March 1, 2018, re-asserting the same copyright infringement claims premised on the *Moodsters* bible and pilot. The SAC labels the characters depicted in these works as the "first generation," and then includes new allegations about a "second generation of *The Moodsters* characters [that] were developed in the 2012-13 time frame." (ER 104.) According to the SAC, "[b]y 2015, various products, including toys and books featuring *The Moodsters* characters [from this 'second generation'] became available for sale at Target" and other retailers. (ER 105.) Before the second generation *Moodsters* products were available for sale, "thousands of [second generation] Moodsters toys and books were donated to schools, disaster relief programs, NGOs, and children's hospitals." (*Id.*) Plaintiffs provided no explanation as to why these allegations were added only once Daniels's implied contract claim had been dismissed with prejudice on the grounds that she had unconditionally disclosed her "idea" back in 2005 and 2007.[4]

---

[4] Plaintiffs did not allege that either of them owned the copyright for any of the products featuring the second generation Moodsters. (*See* ER 99.) The actual products state that the copyright is held by "JellyJam Entertainment Inc." (SER 181; *see also* SER 219–25.) Plaintiffs' opposition brief below stated that JellyJam was "another company owned by Ms. Daniels." (SER 291 at n.14.) It is not a party to this action.

### (a)  "Second Generation" Moodsters

The SAC included screenshots of products featuring the second generation Moodsters, which showed that the characters' names had changed yet again:  The red Moodster (previously Roary, then Rizzi) is now "Razzy"; the green Moodster (previously Shake, then Scootz) is now "Quigly"; the yellow Moodster (previously Zip, then Zazz) is now "Coz"; and the pink Moodster (previously Olovia, then Oola) is now "Lolly."  (ER 105, 117.)

In the "Meet the Moodsters" storybook pictured in the SAC, the Moodsters are billed as "mood detectives."  (SER 225 at 5[5]; *see also* ER 105.)  They magically burst out of a magician's top hat owned by a human boy and "scurried under the bed" in the boy's room.  (SER 225 at 5.)  Coz, the yellow Moodster, explains that they solve "mood mysteries."  (*Id.* at 11.)  They help the boy realize he is feeling angry, and tell him that each of the Moodsters also feels angry sometimes.  (*Id.* at 12–19.)  The yellow Moodster (purportedly the "happy" character in the first generation), is shown feeling angry because his soccer game is getting rained on.  The blue Moodster (in the first generation, the "sad" character) recounts feeling angry when another Moodster laughed at him.  (*Id.* at 19.)

---

[5] Citations to SER 225 refer to the "Meet the Moodsters" storybook pictured in the SAC.  Defendants provided a copy of the storybook to the district court in a manual lodging (SER 268), discussed in the district court's order, and have moved for leave to transmit a copy to this Court.

In addition to the second generation Moodsters' change in names and transformation into mood detectives, there were obvious visual differences from the first generation.  These characters looked less like gangly aliens and more like plump Teletubbies.  Each wore a detective hat and capelette, apparently a nod to their jobs as detectives.  And while the "first generation" creatures live in fictional Moodsterville, the second generation detectives live under a human child's bed.

### (b)    Development of *The Moodsters* Pilot

Plaintiffs also added new allegations about development of *The Moodsters* pilot, stating that experts "suggest[ed] facial expressions and dialogue for particular characters based on their review and interpretation of scientific research on emotions."  (ER 102, 120, 130–31, 141, 150–51.)  During focus groups, "children understood and enjoyed the show" and "liked the *Moodsters* characters." (*Id.*)  The SAC further alleged that Moodsters Co. "discussed *The Moodsters* characters, including the merchandising potential of *The Moodsters* characters, with a number of major entertainment, toy, and publishing companies," such as "PBS, Toys 'R' Us, Nickelodeon, Scholastic Publishing, Manhattan Toy Company, among others."  (ER 103.)

### (c)    Dismissal of the Second Amended Complaint

Defendants moved to dismiss the Second Amended Complaint, noting that none of the new allegations regarding the second generation Moodsters or development of the pilot had any impact on the district court's prior conclusion

that the Moodsters did not qualify for independent copyright protection.  (SER 187–88, 308-10.)  The district court again granted the motion in full—this time with prejudice.  (ER 9–10.)

Plaintiffs had argued that the second generation characters established that "traits and attributes which appeared in the 2005 bible and 2007 pilot have persisted over time."  (ER 5.)  The district court disagreed, noting that "[t]he JellyJam characters *again* have new names, constituting the third set of names in as many iterations"; "the first generation of Moodsters lived in a world called Moodsterville . . . while the new characters live in a magician's top hat under a child's bed"; the second generation "are now 'mood detectives' and 'little detectives,' and wear detective hats and capelettes"; and "the second generation characters bear little *physical* resemblance to the first."  (*Id.*)  The district court concluded that "inclusion in the [second] amended complaint of the second generation characters . . . demonstrates that the majority of the characters' traits, including such basic qualities as their names, are fluid," and any shared traits remained generic.  (ER 6.)  Nor did the new allegations regarding the pilot's development process change the court's ruling, as "[n]one of the new contentions bear on the finished product: the characters that appeared in *The Moodsters* bible and pilot, which the Court has already considered."  (ER 7.)

The court further reasoned that, "even if the second generation characters *did* render *The Moodsters* characters distinctive enough for independent copyrightability, the characters would become protectable at the point when they displayed consistent, widely identifiable traits," which was *after* the alleged copying by Defendants—in other words, even if the second generation Moodsters were copyrightable, this would not retroactively protect the first generation Moodsters at the time of the alleged copying so as to sustain a claim for unlawful infringement.  (ER 6.)

The district court again dismissed Plaintiffs' claim with respect to the ensemble of Moodsters characters.  (ER 8–9.)  Plaintiffs had argued that the ensemble might be protectable under the "story being told" standard, but the court explained that, "after *Towle*, copyright in graphically depicted characters is available only 'for characters that are especially distinctive" and "display 'consistent, widely identifiable traits.'"  (ER 9.)  The Moodsters fell short.

Plaintiffs' suit was dismissed with prejudice, and this appeal followed.

## <u>SUMMARY OF THE ARGUMENT</u>

1.  The district court correctly held that the Moodsters characters, whether considered individually or as an ensemble, are not entitled to copyright protection independent of the works in which they appear.  In *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015), this Court consolidated existing precedent to establish the

definitive three-part test for determining whether graphically depicted characters, such as the Moodsters, are independently copyrightable separate from their underlying works.  Under that test, a character must (1) have "'physical as well as conceptual qualities,'" (2) "be 'sufficiently delineated' to be recognizable as the same character whenever it appears," and (3) "be 'especially distinctive' and 'contain some unique elements of expression.'"  *Id.* at 1020–21.  "Considering the character as it has appeared in different productions, it must display consistent, identifiable character traits and attributes," and "courts have deemed the *persistence* of a character's traits and attributes to be key to determining whether the character qualifies for copyright protection."  *Id.*  (emphasis added).  The district court properly followed the guidance in *Towle*, evaluating the persistence of the characters' attributes—including their names—as the characters "appeared in different productions."

The district court did not err in determining as a matter of law that the Moodsters failed to satisfy *Towle*, and certainly did not violate Plaintiffs' "right to a trial by jury" in doing so.  *Towle* expressly rejected the argument "that a jury should decide the question whether the Batmobile displayed unique elements of expression and consistent, widely identifiable traits."  *Id.* at 1022.  Plaintiffs' citation to *Halicki Films, LLC v. Sanderson Sales & Marketing*, 547 F.3d 1213 (9th Cir. 2008), a case preceding *Towle* by seven years in which the threshold question

-18-

of copyrightability was raised for the first time on appeal, does not countermand *Towle*'s guidance. Plaintiffs otherwise rely on disapproved case law which has been retired following *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), further undermining their argument concerning proper procedure on a motion to dismiss. Plaintiffs have failed to identify any factual dispute which would prevent the district court here from evaluating whether the Moodsters were especially distinctive and sufficiently delineated based on a review of the works themselves and Plaintiffs' factual allegations.

At base, Plaintiffs disagree with the standard articulated in *Towle*, as the Moodsters cannot satisfy it. Indeed, Plaintiffs have declined to offer any argument or analysis as to the independent protectability of three of the four individual characters allegedly infringed; these claims have been waived as a result. The one character evaluated in Plaintiffs' opening brief is never identified by name, an implicit acknowledgement that this character's three different names in as many works is incompatible with the character being recognizable as the same character wherever it appears. *The Moodsters*'s lightly sketched characters lack traits distinguishing them from stock characters exhibiting the emotions to which they are associated.

The Moodsters characters are not independently copyright-protected when considered as an ensemble, either. The ensemble of Moodsters fails to meet the

requirements of either *Towle* or the superseded "story being told" test on which Plaintiffs rely.

2.  The district court properly dismissed Daniels's common law claim for breach of an implied-in-fact contract under *Desny v. Wilder*, 299 P.2d 257 (Cal. 1956). *Desny* cautions that "[t]he law will not in any event, from demands stated subsequent to the *unconditioned disclosure* of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure." *Id.* at 270 (emphasis added). Thus, a *Desny* claim cannot be sustained where a plaintiff unconditionally discloses her idea through publishing a novel or posting it on the internet. Daniels's own *Desny* claim fails as a matter of law given her repeated, unconditional disclosure of the "idea" behind the Moodsters.

The district court properly dismissed Daniels's *Desny* claim in light of her publication of the *Moodsters* bible in 2005 and the pilot in 2007. The copyright registrations for these works attested to the dates of publication, and judicially noticeable materials show that the pilot episode was posted to YouTube in 2007. Daniels does not even attempt to dispute that she published the pilot by sharing it on the internet, rendering her disagreement with a portion of the district court's decision below an academic one. In publishing the pilot, Daniels both prevented the formation of an implied-in-fact contract for lack of consideration (that is, an

undisclosed idea) and excused performance under any implied contract purportedly entered into previously.

Allegations in the Second Amended Complaint concerning the distribution of the second generation Moodsters products, inserted only after the implied contract claim was dismissed with prejudice, further confirms the appropriateness of dismissal. If Daniels is correct that her implied contract claim accrued with the nationwide release of *Inside Out*, then the distribution of the Moodsters products before that point destroyed the consideration for any prior implied contract, dooming her claim. And if Daniels concedes that her implied contract claim accrued through the pre-release advertising and promotion of *Inside Out*, as Defendants argued below, then her claim is barred by a two-year statute of limitations.

## STANDARD OF REVIEW

Defendants agree with Plaintiffs' statement that this Court reviews *de novo* a district court's decision to grant a motion to dismiss.

## ARGUMENT

**A.** **The Court Should Affirm Dismissal of the Copyright Infringement Claims Because the Moodsters Characters Are Not Independently Copyrightable.**

The crux of Plaintiffs' appeal is that the district court applied the incorrect substantive or procedural law in evaluating the independent copyrightability of the

Moodsters. Plaintiffs' arguments are tantamount to an assertion that this Court's 2015 decision in *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015), was incorrect and should be cast aside for one of the many alternative approaches proposed in Plaintiffs' opening brief. The Court should instead affirm the district court's judgment, which faithfully applied *Towle* in concluding that Plaintiffs' characters, whether considered individually or as an ensemble, do not warrant copyright protection when considered separate from the underlying works in which they appear.

1. **The District Court Properly Applied the Three-Part Test Articulated in *Towle* to Evaluate Whether the Moodsters Warrant Independent Copyright Protection as a Matter of Law Based on Undisputed Facts.**

The Ninth Circuit consolidated relevant precedent in *Towle* to establish a three-part test for determining whether a visually depicted character is entitled to independent copyright protection; there is no alternative standard for Plaintiffs to resort to. They strain against the straightforward application of the *Towle* standard, arguing that the factors expressly highlighted in *Towle*, like the "persistence" of a character's traits, the appearance in multiple works, or whether the character is recognizable whenever it appears, are not validly considered. Adopting Plaintiffs' position would necessitate overruling this Court's 2015 decision in *Towle*.

Plaintiffs' procedural arguments fare no better: They rely heavily on this Court's decision in *Halicki Films, LLC v. Sanderson Sales & Marketing*, 547 F.3d 1213 (9th Cir. 2008), issued years prior to *Towle*, in which the question of character copyrightability was raised for the first time on appeal, and case law which has been overruled following *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Most importantly, they fail to raise any factual disputes that would prevent the Court from determining the independent copyrightability of their characters based on a review of the works featuring those characters and Plaintiffs' own factual allegations.

### (a) *Towle* Consolidated Relevant Precedent to Establish the Governing Standard for Graphically Depicted Characters; The "Story Being Told" Test Is Not Applicable.

In evaluating whether two story-based works—whether a novel, television show, or theatrical motion picture—are substantially similar under the extrinsic test for copyright infringement, courts look to "'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works," after filtering out any unprotectable elements of the plaintiff's work. *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). In this context, fictional characters are considered as an expressive element of the copyrighted work as a whole, and the extent of a defendant's

copying of a character will be taken into account when examining whether substantial similarity exists between the works.

Congress has rejected prior proposals to provide categorical protection for fictional characters when considered *apart* from the work in which they appear. As the Register of Copyrights explained in a report regarding the categories of copyrightable works in the current version of the Copyright Act:

> Proposals have been advanced for identifying fictional characters as copyrightable works in themselves under the bill. There are undoubtedly some characters that are developed in detail and with such breadth and depth that they emerge as separately identifiable parts of the copyrighted works in which they appear. Others, perhaps the large majority, cannot be said to represent independent creations apart from the particular literary or pictorial works depicting them. As is equally true in the case of detailed presentations of plot, setting, or dramatic action, we believe it would be unnecessary and misleading to specify fictional characters as a separate class of copyrightable works.[6]

It has thus been left to courts to determine when a fictional character has been developed in sufficient detail and depth to justify copyright protection for that character when divorced from the other elements of the underlying work in which it appears. The result is unsurprising. "Seldom are characters in copyrighted

---

[6] U.S. Copyright Office, Supplementary Register's Report on the General Revision of the U.S. Copyright Law (H. Comm. Print, 89th Cong., May 1965), *available at* http://www.ipmall.info/sites/default/files/hosted_resources/lipa/copyrights/Supplementary%20Register%27s%20Report%20on%20the%20General%20Revision%20of.pdf; *see also* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.12[A][1] (Matthew Bender, Rev. Ed.) ("The Register of Copyrights hit the nail on the head, explaining why 'fictional characters' are not separately identified as copyrightable works under the current Act.") (citation omitted).

works afforded their own copyright protection outside of the works they are found in.'" *Gallagher v. Lions Gate Entm't Inc.*, 2015 WL 12481504, at \*7 (C.D. Cal. Sept. 11, 2015).

In *Towle*, this Court carefully evaluated existing precedent and articulated a three-part test for determining whether a graphically depicted character is entitled to independent copyright protection, noting at the outset that "[n]ot every comic book, television, or motion picture character is entitled to copyright protection." 802 F.3d at 1019. Under the test articulated in *Towle*, to warrant copyright protection separate from the work in which it appears, a character must (1) have "'physical as well as conceptual qualities,'" (2) "be 'sufficiently delineated' to be recognizable as the same character whenever it appears," and (3) be "'especially distinctive' and 'contain some unique elements of expression.'" *Id.* at 1020–21. This Court further explained that, "[c]onsidering the character as it has appeared in different productions, it must display consistent, identifiable character traits and attributes[.]" *Id.* "[C]ourts have deemed the *persistence* of a character's traits and attributes to be key to determining whether the character qualifies for copyright protection." *Id.* (emphasis added).

The district court below faithfully applied this standard in evaluating whether the characters in the *Moodsters* bible and pilot episode were entitled to independent copyright protection. Plaintiffs, unable to satisfy the *Towle* standard,

insist that the district court erred by declining to evaluate whether the Moodsters characters as an ensemble alternatively might satisfy the "story being told" test articulated in *Warner Brothers Pictures, Inc. v. Columbia Broadcasting Systems, Inc.*, 216 F.2d 945, 950 (9th Cir. 1954).  (Appellants' Opening Br. ("AOB") 48–49.)  While Plaintiffs contend that the "story being told" test from *Warner Brothers* "remains valid until this Court overrules it," *Warner Brothers* does not purport to apply to graphically depicted characters; as Plaintiffs note, the decision "determined that copyright law may protect a *literary character* if he is the 'story being told.'"  (AOB 18, 49 (emphasis added).)  *Towle* discussed the *Warner Brothers* case before arriving at its three-part test for graphically depicted characters, and did not purport to overturn the applicability of *Warner Brothers*' "story being told" test to literary characters.  802 F.3d at 1019–21.  Following this Court's decision in *Towle*, the "story being told" test simply does not govern a copyrightability determination for graphically depicted characters like the Moodsters.

> **(b)** **Under *Towle*, a Court May Consider the Persistence of a Character's Attributes in Different Productions.**

This Court's decision in *Towle* establishes the governing standard for determining when a character merits independent copyright protection, and expressly invites consideration of factors such as whether the character's traits

have persisted over time, or in multiple works.  The district court did not err by likewise considering those factors as applied to the Moodsters characters.

Rather than evaluate their characters under the standard articulated in *Towle*, Plaintiffs advocate for an entirely different benchmark.  They conclude that, because "[a]n artist obtains a copyright when she expresses her original idea in a fixed medium," the district court "erred by focusing on events arising after Moodsters Co. reduced the characters to a fixed medium—both in the bible and the pilot episode—like the extent of distributions of *The Moodsters* bible and pilot, and persistence 'over time or over multiple iterations.'" (AOB 42–43.)  Plaintiffs never acknowledge that the district court's focus on the persistence of a character's traits and attributes was drawn directly from this Court's guidance in *Towle*. Plaintiffs also state that "the originality necessary for copyright is 'extremely low,'" suggesting that this should be the standard for independent copyright protection for the Moodsters characters.  (AOB 40.)  Fundamentally, Plaintiffs are drawing an equivalence between the copyright of the underlying work as a whole and a character's achievement of independent protection apart from the work.  But that is not the standard for independent character protection found in *Towle*.

As this Court has observed, the determination that a character has demonstrated "identifiable character traits and attributes" and is "recognizable as the same character whenever it appears," *Towle*, 802 F.3d at 1020–21, may take

into account whether the character has consistently exhibited especially distinctive traits after the character's initial creation. James Bond was found to be an independently copyrightable character because, "[l]ike Rocky, Sherlock Holmes, Tarzan, and Superman, James Bond has certain character traits that have been developed over time through the sixteen films in which he appears." *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995). The same is true of Godzilla, who appeared in 10 motion pictures over the decades. *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215–16 (C.D. Cal. 1998). In *Towle*, this Court noted that the Batmobile's "name and key characteristics as Batman's personal crime-fighting vehicle have remained consistent" in depictions "[o]ver the past eight decades [of] comic books." 802 F.3d at 1015.[7]

Consistent use of a name is key to developing a character that is recognizable whenever it appears. "[A]lthough copying of a character's name is not in itself decisive, it is a factor to be considered in determining whether the

---

[7] A case relied upon by Plaintiffs—*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 772 F. Supp. 2d 1135 (C.D. Cal. 2008), *aff'd in part, vacated in part,* 654 F.3d 958 (9th Cir. 2011) (AOB 39)—acknowledges that a character's achievement of independent protection under copyright can occur after the point of first fixation. There, the court was tasked with determining "*when* the Betty Boop character became protected as a component part of a copyrighted work," answering the question by "look[ing] to *when* the character 'displayed consistent, widely identifiable traits.'" 772 F. Supp. 2d at 1145–47 (emphases added) .

character as appropriated is sufficiently distinctive to constitute an infringement."
1 Nimmer, supra, § 2.12. This relationship between the distinctiveness of a
character and the nature of the appropriation is also found in the case law discussed
in *Towle*: in each case which found a character independently copyrightable, the
allegedly infringing work seeks to trade on the recognizability of the plaintiff's
character, typically including its name.[8] For instance, in *Towle*, the defendant car
maker, doing business as "Gotham Garage," manufactured replicas of the
Batmobile that it intentionally advertised as the "Batmobile." 802 F.3d at 1017.
The Court took account of the Batmobile's "unique and highly recognizable name"
in discussing its "'especially distinctive'" elements of expression. *Id.* at 1022.
Likewise, the recognizability of Godzilla was the draw for the defendant in *Toho
Co.*, which published a book titled "Godzilla" featuring images of Godzilla taken
from copyrighted movies. 33 F. Supp. 2d at 1215. James Bond's independent
copyrightability was determined in a case where the defendant intentionally traded
upon the recognizability of the character by creating a car commercial centered
around "James Bob," and expressly asked casting directors for "'James Bond'-type
actors and actresses to star in what conceptually could be 'the next James Bond

---

[8] Even in *Halicki*, in which this Court refrained from ruling on the copyrightability
question, the character's name was a featured consistency between the works. 547
F.3d at 1225 ("In the Original [film], the main character says 'I'm getting tired of
stealing this Eleanor car.' And in the Remake [film], the main character refers to
his history with Eleanor.").

film.'" *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1291–92. However a character might achieve the type of recognizability that can be capitalized on, it is clear that the Moodsters characters, with their ever-changing set of names, do not have it.

Even the cases cited by Plaintiffs decided before *Towle* highlight the importance of the recognizability of a character, including its name. For instance, *Bach v. Forever Living Products U.S., Inc.*, 473 F. Supp. 2d 1127, 1136 (W.D. Wash. 2007) (AOB 38), considered a literary character named "Jonathan Livingston Seagull" from a single novel of the same name. The defendant company had appropriated the Jonathan Livingston Seagull character and story in its advertising, promotional, and training materials: the company's website noted that "Jonathan's story, told in Richard Bach's 'Jonathan Livingston Seagull,' serves as an inspiration and provides us with a wealth of valuable lessons," the company's logo was called "Jonathan Livingston Seagull," and company publications stated that a corporate "bonus is named after Jonathan Livingston Seagull, the allegorical seagull from the story by Richard Bach." *Id.* at 1130–31. *Bach* commented that it was "inconsequential" whether the character had "been delineated over time," *id.* at 1136, but said nothing about whether the character had achieved recognizability by some other means, which is what the later-decided

opinion in *Towle* makes clear a plaintiff must establish for graphically depicted characters.[9]

### (c) The District Court Did Not Err in Determining Independent Copyrightability as a Matter of Law.

Plaintiffs' assertion that the question whether the Moodsters characters are independently copyrightable is necessarily one for a jury is based on a misreading of case law, and an unfounded assumption that evaluation of the Moodsters under *Towle* involves factual disputes.

Plaintiffs argue that "[t]he district court erred in its application of" the motion to dismiss standard. (AOB 27.) They rely on *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 248 (9th Cir. 1997), and *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), for the proposition that a complaint should not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'" (AOB 27), and that, under

---

[9] Plaintiffs also cite *Edgar Rice Burroughs, Inc. v. Manns Theatres*, 1976 WL 20994 (C.D. Cal. Dec. 20, 1976), for the notion that "Cheeta," the ape in *Tarzan*, meets the Ninth Circuit's standard. (AOB 39 n.12.) But *Burroughs* did not analyze whether, much less hold that, "Cheeta" was independently protected by copyright. The plaintiff sought to enjoin the distribution of an X-rated film titled "TARZ & JANE & BOY & CHEETA," and the court held that the film "being advertised and distributed by defendants infringes the copyrights of plaintiff in its literary works." 1976 WL 20994, at *1–2,*4–5. As this Court subsequently commented, the *Burroughs* case clearly "involved only the *names* of celebrities, not their actual performances." *Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 596 (9th Cir. 2000).

this standard, "'the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'"  (AOB 20–21 (quoting *Gilligan*, 108 F.3d at 249).)  The Supreme Court expressly abrogated the language now quoted by Plaintiffs in *Twombly*.  550 U.S. at 562–63 ("We could go on, but there is no need to pile up further citations to show that *Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough.").  That the standard in *Conley* and therefore *Gilligan* were overruled by *Twombly* has been recognized repeatedly, including by the Supreme Court and this Court.[10]  The district court could not have erred by applying *Twombly*, rather than the erroneous standard parroted by Plaintiffs to this Court.

The district court properly considered, in addition to Plaintiffs' factual allegations, matters incorporated by reference and subject to judicial notice.  *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (courts "'need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit'" or "'by documents referred to in the complaint'").  This provided a sufficient basis to determine as a matter of law

---

[10] *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 670 (2009) (*Twombly* "retired the *Conley* no-set-of-facts test"); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 911 (9th Cir. 2012) (*Iqbal* and *Twombly* abrogated *Conley*); *see also Gulden v. Consolidated World Travel Inc.*, 2017 WL 3841491, at *2 n.4 (D. Ariz. Feb. 15, 2017) (plaintiff's statement of 12(b)(6) standard relying on *Gilligan* and *Conley* "is no longer an accurate statement of the law" after *Twombly*).

whether the Moodsters characters were independently copyright-protected. As the *Fleischer Studios* court explained, "the question of when Betty Boop became a protectable element within a particular work depends 'solely on a comparison of the works in issue rather than on the credibility of witnesses or other evidence only for the factfinder,'" comparing the necessary analysis to one "'where both the plaintiff's and defendant's works are before the court, [such that] the court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity.'" 772 F. Supp. 2d at 1146. Similarly, in *Towle* this Court expressly rejected the argument "that a jury should decide the question whether the Batmobile displayed unique elements of expression and consistent, widely identifiable traits." 802 F.3d at 1022. On a *de novo* review of a grant of summary judgment, *Towle* observed that "we are well-equipped to determine whether, as a matter of law, the[] undisputed facts establish that the Batmobile is an 'especially distinctive' character entitled to copyright protection." *Id.* at 1022–23.

Plaintiffs do not acknowledge the clear guidance provided in *Towle* and *Fleisher Studios*, barreling forward with their argument that the district court violated their "right to trial by jury" by deciding this issue as a matter of law. (AOB 26.) The cases Plaintiffs cite for the proposition that "juries—not judges—decide 'fact-intensive' questions in copyright cases" do not support the specific

argument they are trying to make: that character copyrightability cannot be decided as a matter of law in this case.  (AOB 25.)  The quotation Plaintiffs offered from *Direct Technologies, LLC v. Electronic Arts, Inc.*, 836 F.3d 1059, 1067–68 (9th Cir. 2016) (AOB 25), strategically omits this italicized language:  "*If Jones said one thing and Secour said another on the same subject*, it is the role of the jury, not a court on summary judgment, to determine the facts."  Unlike *Direct Technologies*, here there are no credibility determinations to make.  And in *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) (AOB 25), the comment that the plaintiff had "a constitutional right to a jury trial on his copyright infringement claims" was offered as an explanation for why the trial court did not err in bifurcating the equitable defense of laches.

The cornerstone to Plaintiffs' argument that a jury must decide whether the Moodsters satisfy the *Towle* standard is this Court's decision in *Halicki*, decided seven years before *Towle*.  Setting aside the fact that *Towle* itself rejected such a categorical proposition, *Halicki*'s decision to remand for fact-finding was attributable to the specific procedural history in that case, not a grander principle that Plaintiffs attempt to manufacture.  Specifically, the question whether the character at issue—Eleanor, a sports car originally featured in the 1974 motion picture *Gone in 60 Seconds*—was independently protected by copyright separate from the underlying movie was raised for the first time on appeal.  *See* 547 F.3d at

1224. The plaintiff in *Halicki* had appealed from a summary judgment ruling that she lacked standing to bring a copyright infringement claim because she had transferred the rights to Eleanor, but the question whether the character of Eleanor was entitled to independent copyright protection was never presented to the district court. *See id.* at 1219. Because neither side addressed the independent copyrightability of Eleanor, "[t]he District Court did not directly examine the question of whether Eleanor is a character deserving of copyright protection" and "therefore never addressed the question of what the appropriate standard is for making such a determination." *Id.* at 1224–25. And when the issue was squarely raised for the first time in the appellate answering brief, defendants did not cite to facts in the record; nor did plaintiff when responding to the argument in her appellate reply brief.[11] The decision to remand to the district court "for a finding in the first instance as to whether Eleanor is entitled to copyright protection" under such circumstances is of limited, if any, precedential value here. *Id.* at 1225.

More fundamentally, Plaintiffs fail to point to any factual dispute which might prevent the character copyrightability question from being decided as a matter of law. At oral argument, when Plaintiffs' counsel pointed to *Halicki* in arguing that the character copyrightability determination could not be decided

---

[11] Appellees have filed the briefing from the *Halicki* appeal in a Request for Judicial Notice filed concurrently with this brief. *See* Appellees' Request for Judicial Notice, Exs. A–D.

based on the facts before the court, Judge Gutierrez responded skeptically, "What else are we going to find out about these characters? If I take judicial notice, what else am I going [to] learn about the characters that I couldn't decide that now?" (ER 326, Tr. 18:9–12.) Plaintiffs were granted leave to file a Second Amended Complaint, which included new allegations about the process for developing the *Moodsters* pilot and the second generation Moodster detectives. The district court considered these new allegations against the *Towle* standard, and found they did not change the end result—not because of a factual dispute, but because the additional facts were legally irrelevant to its evaluation of the Moodsters for purposes of maintaining an infringement claim against Defendants.[12]

### 2. *The Moodsters* Characters Are Not Independently Copyrightable.

### (a) Plaintiffs Have Waived Their Arguments as to Three of the Individual Moodsters Characters.

Nowhere in the entirety of Plaintiffs' brief do they mention any of the Moodsters characters by name—whether taken from the first, second, or third set of names used for these characters. Aside from the red Moodster (variously named Rizzi, Roary, and Razzy), referred to in the opening brief as "the Anger character," Plaintiffs never even identify which Moodsters were allegedly infringed by *Inside*

---

[12] Plaintiffs are incorrect in suggesting that the district court erred in not expressly discussing *Halicki* in its written order below. (AOB 24–25.) *See* Fed. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12.").

*Out.* Moodsters Co. sums up its entire position on three of the copyright infringement claims which are ostensibly at issue in this appeal by stating that its argument "that the Anger character is copyrighted" is "representative of its allegations for the remaining individual characters and [it] otherwise rests on the detailed allegations for those counts." (AOB 34.) This is both a tacit admission that *none* of the individual characters are particularly distinct and a legal waiver of the copyright claims based on the other three characters.

This Court has "repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief." *Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (citation omitted). The Court reviews "'only issues which are argued specifically and distinctly in a party's opening brief,'" and "[s]ignificantly, '[a] bare assertion of an issue does not preserve a claim.'" *Id.* (citation omitted). The Court "require[s] contentions to be accompanied by reasons." *Id.* at 930. Moodsters Co. has failed to satisfy its "burden on appeal to present the court with legal arguments to support its claims" on three of its characters, and, as a consequence, these claims are waived. *See also Aramark Facility Servs. v. Serv. Emp. Int'l Union*, 530 F.3d 817, 824 n.2 (9th Cir. 2008) (appellant "has waived these arguments by failing adequately to brief them").

### (b)     The Red Moodster Is Not Sufficiently Delineated and Recognizable, Nor Especially Distinctive.

As Plaintiffs have failed to muster any specific argument in support of the protectability of any character other than the red Moodster, Defendants will address in detail only the individual copyrightability of that single character.[13]

*Towle* drew a distinction between protectable characters which are "'sufficiently delineated' and display 'consistent, widely identifiable traits'" and "characters that have been 'lightly sketched' and lack descriptions [which] may not merit copyright protection." *Towle*, 802 F.3d at 1019–20; *see also Fun With Phonics, LLC v. Leapfrog Enters., Inc.*, 2010 WL 11404474, at *5–6 (C.D. Cal. Sept. 10, 2010) ("[C]haracters that are 'lightly sketched' through only short summaries and 'whatever insight into their characters may be derived from their

---

[13] To the extent this Court is inclined to review the district court's rulings on the copyrightability of three other characters based on Plaintiffs' arguments concerning the red Moodster alone (*see* AOB 34), Defendants request they be afforded the same consideration. As pointed out in briefing to the district court, Plaintiffs relied heavily on visual depictions in asserting that each of their characters are especially distinctive and sufficiently delineated, but ignored the other elements which must be considered, including the characters' names (which changed between the works at issue). Nor did Plaintiffs identify any attribute that would distinguish their "scared" character (Shake/Scootz), their "happy" character (Zip/Zazz), or their "sad" character (Sniff/Snorf) from any other stock character expressing fear, happiness, or sadness. (*See* SER 15-18, 158-62, 184-88, 305-10.) Moreover, as discussed below, each of these characters also expresses *anger* in a generic, stereotypical manner—not just the "angry" character featured in Plaintiffs' opening brief. The district court properly concluded that each of Plaintiffs' lightly sketched characters did not warrant independent copyright protection under *Towle*.

dialogue and action' are not entitled to independent protection."); *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988) (same). The red Moodster from the bible (Roary) and the pilot (Rizzi) is lightly sketched, not a "sufficiently delineated" character deserving of copyright protection. *Towle*, 802 F.3d at 1020–21. Here, we have only the short description of the characters in the *Moodsters* bible and what can be gleaned from the minimal dialogue and events in the pilot episode. Plaintiffs' promotional materials and pilot do not develop the red Moodster—first named Roary, then Rizzi—beyond its basic depiction of universal emotions.

Characters are deemed "not particularly distinctive" when they "fit general, stereotypical categories. . . . Consequently, these characters are not entitled to copyright protection." *McCormick v. Sony Pictures Entm't*, 2009 WL 10672263, at *14 (C.D. Cal. July 20, 2009), *aff'd,* 411 F. App'x 122 (9th Cir. 2011). There is no "personality trait" or distinctive mannerism that would distinguish Plaintiffs' typically "angry" character from a stock angry character. *Cf. Alexander v. Murdoch*, 2011 WL 2802899, at *10 (S.D.N.Y. May 27, 2011) ("[A]ttraction to blonde women cannot be said to be a rare or unique character trait; it is a basic character type and is not copyrightable."). Plaintiffs assert that the complaint "described how and why the Anger character is not a stock character" (AOB 35), but fail to explain how this character's expression of anger is especially distinctive.

The character expresses its anger in stereotypical ways by design—the stated aim of Plaintiffs' project is to help preschoolers identify emotions, and drawing upon universal expressions of a particular emotion are key. Thus, in the *Moodsters* pilot, Rizzi manifests her anger by stomping her feet, yelling, slamming a door, and furrowing her brow. (ER 204 at 8:46–13:44.) Because of that generic quality, the other Moodsters correctly interpret Rizzi's reaction as an angry one. (*Id.*)

Plaintiffs also assert that "the Anger character" is recognizable whenever it appears, but fail to address the fact that Roary/Rizzi is not the only character in *The Moodsters* (much less all works featuring animated characters) who feels the emotion of anger. Another character in the pilot, Moodini, expressly acknowledges that Rizzi's expression of anger is common, and admits to feeling the same anger when she feels left out as Rizzi did. (*Id.* at 15:00–17:29.) Moreover, it is not just Rizzi and Moodini who feel anger when excluded by friends. The *Moodsters* bible presented a sample show idea depicting the same scenario as in the pilot, but with Sniff as the character excluded by friends and feeling angry. (ER 194.) Sniff's friends hang out without him, and though he initially thinks he is sad, it turns out that he is actually "very angry." (*Id.*) Plaintiffs' reminder that experts suggested "specific facial expressions and dialogue reflecting the experts' interpretation of how to express or reflect certain

scientific research on the emotion" merely serves to confirm that any character in Plaintiffs' works feeling anger is sharing in a universal emotion. (AOB 35.)[14]

That Roary/Rizzi is red and the only one who has a "tendency to literally explode from the head when most angry" (AOB 34) does not render the character especially distinctive on its own. An angry person is said to be seeing red, hot-blooded, hot under the collar, red with rage, burning with anger, breathing fire, smoldering, fuming, have a short fuse, or likely to blow her top. (*See, e.g.,* SER 209-10, 226–46; ER 184 ("Roary is the most likely Moodster to get frustrated and 'blow her top.'").) Consistent with the cultural association between anger and the color red and heat, cartoons routinely demonstrate a character's emotional reaction of anger by having the character turn red and explode with anger—literally. *See Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007) ("In the context of copyright claims, the Court may take judicial notice of generic elements of creative works," including those that are "generally known and can be verified simply by watching television for any length of time."); *see also* SER 198.

---

[14] Plaintiffs' citation to factual allegations that, during focus group testing, "children understood and enjoyed the show" and "88% like the Anger character" (AOB 35), shows a continued misunderstanding of the applicable legal standard. As stated by the district court, "that the children enjoyed the show or that their focus group was led by leading professors has no bearing on the Court's analysis of the characters themselves." (ER 7.)

Finally, Plaintiffs fail to explain how "the Anger character" could be "recognizable whenever the character appears" when this character has been given a name change in every iteration of the *Moodsters* works. (AOB 35.) In proceedings below, Plaintiffs argued that their characters are "recognizable as the same character whenever they appear because they are identified by individual colors and emotions" such that "there is no confusion which character is which when one comes on scene" (SER 134), as though all of the characters within a work should qualify for independent protection so long as they can be distinguished from one another. That is a good start for creating a coherent storyline, but it is not the standard in *Towle*.

### (c) The Second Generation Moodsters Do Not Render the First Generation Especially Distinctive and Recognizable.

Plaintiffs assert that the district court "erred by refusing to consider the success of the second generation of The Moodsters characters." (AOB 16.) The district court did consider these characters, and determined that because the first generation displayed only generic, stereotypical traits, the repetition of these traits in another iteration still does not render Plaintiffs' first generation characters especially distinctive or sufficiently delineated such that they are recognizable wherever they appear. And the second generation characters—which have new names, new jobs as detectives, new looks, and live in a human world under a

child's bed—could not possibly contribute to the recognizability of the characters in the bible and pilot.

The "Meet the Moodsters" second generation storybook serves to confirm that the red Moodster—the only character whose copyright infringement claim is preserved on appeal—is not especially distinctive or sufficiently delineated.  In the book, the Moodsters help a human boy realize he is feeling angry.  (SER 225.) Both the yellow and blue Moodsters (the "happy" and "sad" characters according to the first generation bible and pilot) are shown feeling angry.  (*Id.*)

In any event, as the district court found, Plaintiffs' attempt to bootstrap with the second generation products also runs into a chronological obstacle:  Defendants allegedly copied Plaintiffs' first generation characters before the existence of the second generation products, so these products do not bear on whether the first generation characters qualified for independent copyright protection at the point that Defendants allegedly copied them.  As stated by the district court, the impact of the second generation Moodsters "'would not have retroactive effect to make the 'first generation' characters independently protectable *at the time of the alleged copying*.'"  (ER 6.)  Plaintiffs complain that the court did not cite authority for this statement, failing to recognize that it flows as a matter of logic from applying *Towle* to determine the point at which a character displayed "'consistent, widely identifiable traits'" and was "recognizable . . . whenever it appears."  802 F.3d at

1019–21; *see also Fleisher*, 772 F. Supp. 2d at 1145–46. Before a character reaches that point, it is not independently protected by copyright separate from the underlying works in which it appears—and copying an unprotected element does not amount to unlawful appropriation. *See Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1124 (9th Cir. 2018). It is nonsensical to invoke the "continuing tort" doctrine regarding reproduction of a non-infringing work, where defendants did not commit a tort when initially creating the work. *Cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014) ("Each time *an infringing work* is reproduced or distributed, the infringer commits a new wrong.") (emphasis added).

### 3. The Ensemble of Lightly-Sketched Moodsters Characters Is Not Entitled to Independent Copyright Protection.

The ensemble of Plaintiffs' lightly sketched characters who, as seen, each feel and express the emotion of anger in ways similar to each other and to all of humanity, are not rendered independently protectable under *Towle* simply by discussing them as a group. Plaintiffs offer no explanation for why the ensemble of characters do not suffer from the same shortcomings under *Towle* as Roary/Rizzi alone. Although "lightly sketched characters may be descriptive enough to sustain a finding of infringement where other [extrinsic test] factors are also copied," *Olson*, 855 F.2d at 1452–53, here Plaintiffs have not alleged copying of any other element of the copyrighted works. Plaintiffs cite to *L.A. Printex Industries, Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849 (9th Cir. 2012), as a

possible avenue for finding the Moodsters copyrightable.  (AOB 33.)  *L.A. Printex* provides that original selection, coordination, and arrangement of unprotectable elements may be expression protectable under copyright law; it is not an alternative standard for finding independent copyright protection for an ensemble of characters *separate* from the work in which they appear.

Plaintiffs urge the Court to draw parallels between Roary/Rizzi, Olovia/Oola, Zip/Zazz, Shake/Scootz, and Sniff/Snorf, and the ensemble of characters depicted in the films Rocky I, Rocky II, and Rocky III, which have been found independently copyrightable as an ensemble.  (AOB 33.)  Plaintiffs understandably decline to explore how the court reached its decision for the Rocky characters.  "The Rocky characters are one of the most highly delineated group of characters in modern American cinema," the court noted, and "[t]he interrelationships and development of Rocky, Adrian, Apollo Creed, Clubber Lang, and Paulie are central to all three movies." *Anderson v. Stallone*, 1989 WL 206431, at *1, *7 (C.D. Cal. Apr. 25, 1989).  In light of the depth and detail in developing the characters, the *Stallone* court had "no difficulty ruling as a matter of law that the Rocky characters are delineated so extensively that they are protected from bodily appropriation when taken as a group and transposed into a sequel by another author." *Id.* at *7.  The unauthorized sequel under consideration was titled "Rocky IV" and "the characters were lifted lock, stock, and barrel from

the prior Rocky movies," including the characters' names. *Id.* at *1, *8. The *Stallone* case does not assist Plaintiffs' cause.

As discussed previously, Plaintiffs also invoke a standard superseded by *Towle* for graphically depicted characters: the so-called "story being told" standard. All but conceding the point, though, Plaintiffs do not even attempt to explain how the Moodsters characters would satisfy that standard, which distinguishes a character who "really constitutes the story being told," from a character who "is only the chessman in the game of telling the story." *Warner Bros.*, 216 F.2d at 950. A character may be entitled to protection under the "story being told" test when "character study constitutes all, or substantially all, of the work." 1 Nimmer, supra, § 2.12[A][3][a]. The structure of the stories in the *Moodsters* bible and pilot are perhaps the antithesis of a character study. As prescribed in the bible, each episode of the *Moodsters* is intended to follow the same structure: "[s]omething happens," which causes a character to "experience[] a feeling he or she can't identify," and, after an "exploratory process," the character "identifies the feeling and figures out how to deal with it." (ER 192.) The Moodsters characters are, to the one, "only the chessman in the game of telling the story" of correctly identifying emotions, and thus "not within the area of the protection afforded by the copyright." *Warner Bros.*, 216 F.2d at 950.

**B.** **The District Court Properly Held that Daniels's Breach of Implied Contract Claim Fails as a Matter of Law Because Daniels Repeatedly, Unconditionally, and Publicly Disclosed Her Idea.**

As the district court noted, under the seminal California Supreme Court case *Desny v. Wilder*, 299 P.2d 257 (Cal. 1956), a "plaintiff cannot predicate an implied-in-fact contract claim on a work that was publicly disclosed *before* plaintiff disclosed it to defendant in exchange for payment if it is used." (ER 14.) Daniels resists this foundational principle, essentially arguing that it does not matter how many people she freely shared her idea with—even posting it on the internet—her direct disclosure to Defendants could still sustain an implied contract claim. Her position is directly at odds with *Desny* itself, which cautioned that "[t]he law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure." 299 P.2d at 270.

Daniels also takes issue with the district court citing to the listed "date of publication" on the copyright registration for the *Moodsters* bible, which is incorporated by reference in the complaint, for purposes of pegging the date the bible was published within the meaning of the Copyright Act. Instead, Daniels tries to create her own definition of "publication," which conflicts with the meaning of publication in the context of a copyright registration. In any event, the assertions in the *Moodsters* bible and the complaint confirm the bible had been

distributed without any restrictions on disclosure of its contents, meaning it had been published. Daniels fails even to acknowledge that the district court's decision was also predicated on the 2007 publication of the pilot, which included posting it to YouTube. (ER 15; SER 36, 80-82, 99–102, 113–15.) Finally, the distribution of the second generation Moodsters—added to the SAC only once the implied contract claim had been dismissed with prejudice—removes any lingering doubt as to whether the "idea" behind the Moodsters characters was publicly disclosed. There is simply no basis for Daniels's pursuit of an implied contract claim.

### 1. Daniels's Unconditional Disclosure of Her Idea Prevents Formation of an Implied Contract Under *Desny.*

The California Supreme Court has acknowledged that "'[t]he general rule of law is that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after voluntary communication to others, free as the air to common use.'" *Desny*, 299 P.2d at 265. By voluntarily publishing the *Moodsters* bible and the pilot, as well as distributing the second generation Moodsters products, Daniels destroyed any potential consideration for the formation of an implied-in-fact contract.

In *Desny*, the plaintiff sought to recover from Paramount Pictures and filmmaker Billy Wilder based on their use of his idea for a film. *Id.* at 260–62. Desny first told his idea to Wilder's secretary, describing the abstract "central idea" of his screenplay, before later expressly conditioning his submission of a

written synopsis of his screenplay on the expectation of compensation if it were used. *Id*. at 262–63. The defendants argued that "'once the idea is disclosed without the protection of a contract, the law says that anyone is free to use it'" and so "'subsequent use of the idea cannot constitute consideration so as to support a promise to pay for such use.'" *Id*. at 264. The court agreed with the defendants' argument as to Desny's initial disclosure of his abstract idea, explaining that "[t]he law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure." *Id*. at 270. "The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power." *Id.*

The rule in *Desny* is an application of a fundamental contract principle: without consideration, there is no contract. Cal. Civ. Code § 1550(4) (consideration is "essential to the existence of a contract"); 1 Witkin Summary 11th Contract § 202 (2018). Just as the statute of limitations for a *Desny* claim is triggered by the defendants' public use of the plaintiff's idea based on the notion that disclosure "would certainly destroy any further marketability of the idea" for the plaintiff,[15] a plaintiff should not be permitted to publicly disclose her idea

---

[15] *Thompson v. Cal. Brewing Co*., 12 Cal. Rptr. 783, 785–86 (Ct. App. 1961).

(much less exploit it for profit) and still maintain an implied contract founded on the consideration of an undisclosed idea.

The court's decision in *Quirk v. Sony Pictures Entertainment, Inc.*, 2013 WL 1345075, at *12 (N.D. Cal. Apr. 2, 2013), illustrates this principle. In that case, the plaintiff asserted a breach of implied-in-fact contract claim alleging that the defendants failed to compensate him for the adaptation of his novel in making a motion picture. *Id.* at *11. The district court found that "regardless of the precise circumstances" surrounding the defendant's acquisition of the plaintiff's ideas, the plaintiff's "voluntary wide public distribution of [his] ideas years before defendants ever began working on their movie" doomed the claim. *Id.* Citing *Desny*, the district court held that the plaintiff's publication of the novel was an "unconditioned disclosure" of all of his ideas, and that after the unconditional disclosure, no implied promise to pay for freely available ideas could be implied. *Id.* at *11–12.

Particularly on point is the court's decision in *Alexander v. Metro-Goldwyn-Mayer Studios Inc.*, 2017 WL 5633407, at *8–10 (C.D. Cal. Aug. 14, 2017), in which the plaintiff's posting of his ideas on the internet was fatal to his ability to bring a *Desny* claim against studio defendants to whom he also was directly pitching. Specifically, the plaintiff made a "'pitch reel,' a short promotional film about" his screenplay, which he posted on Vimeo, "a social networking platform

for sharing video content," and his own website. *Id*. at *1. The court concluded that these allegations demonstrated that the plaintiff "offered [his] idea gratuitously," including to the defendants, by posting it online, and accordingly dismissed the plaintiff's breach of implied contract claim. *Id*. at *9. The court stated that, regardless of industry customs, the plaintiff could not expect compensation "after plastering his [movie] idea all over the Internet," where there were no conditions on such disclosures. *Id.* The "concern outlined in *Desny* comes to fruition" in a situation like this, in which the "'idea man [] blurts out his idea,'" albeit through more advanced technology. *Id*. at *10 (quoting *Desny*, 299 P.2d at 270).

Daniels argues that it is inconsequential that "some people other than Disney knew of her idea" because "[a]n idea need not be novel to serve as consideration," "[n]or does the idea need to be confidential." (AOB 52–53.) Daniels sets up a strawman by conflating the required consideration for a *Desny* claim (an idea which plaintiff has not already disclosed) with the requirement for a *copyrightable* work. There is no dispute that copyright protectability is not necessary to show consideration for an implied contract. A plaintiff's consideration can be an abstract idea drawn from generally known concepts—as is Daniels's "idea" of using anthropomorphized emotions as characters and color-coding the emotions using common linguistic associations between red and anger, blue and sadness, and

yellow and happiness. "[T]he question of originality or novelty" arises in the context of copyright protectability, whereas "[t]he question of protect[a]bility need not be considered in determining the sufficiency of the allegations" for a claim founded on contract. *Weitzenkorn v. Lesser*, 256 P.2d 947, 954, 957 (Cal. 1953) (AOB 53); *see also Chandler v. Roach*, 319 P.2d 776, 780–81 (Cal. Ct. App. 1957) ("'The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract.'") (AOB 53).

To the extent that Daniels suggests that a *plaintiff* can publicly disclose the idea she intends to use as consideration for an implied contract, that proposition is counter to *Desny*'s core principle that no implied contract can follow a plaintiff's "unconditioned disclosure of an abstract idea." 299 P.2d at 270. Moreover, "proof of the existence of an implied-in-fact contract" evidences "the confidentiality of the submission." *Faris v. Enberg*, 158 Cal. Rptr. 704, 712 (Ct. App. 1979).[16]

## 2. Daniels's 2005 Publication of the *Moodsters* Bible Prevented the Formation of an Implied Contract.

The copyright registration for the 2005 version of the *Moodsters* bible asserts that the "date of publication" was November 8, 2005. (ER 378, SER 87–

---

[16] Daniels's reliance on a case from the Northern District of New York, discussing New York law in depth and merely remarking that "California law applies the same rule for novelty" with a citation to *Desny*, demonstrates how far Daniels must stretch to find support for her position. (*See* AOB 53 (providing parenthetical description of *West v. eBay, Inc.*, 2017 WL 5991749 (N.D.N.Y. Dec. 1, 2017)).)

88.) "Publication" has a defined meaning within copyright law: It is "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," as well as "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution …." 17 U.S.C. § 101. The legislative history explains that "a work is 'published' if one or more copies … embodying it are distributed to the public" with "no explicit or implicit restrictions with respect to disclosure of its contents." H.R. Rep. No. 94-1476, at 138 (1976).

The district court cited the copyright registration for the 2005 bible in noting that the work was published—consistent with the meaning of that word as used on the copyright registration—in November 2005. (ER 15.) The copyright registration was incorporated by reference into the complaint,[17] and even the opening brief in this appeal affirmatively relies on the copyright registration as "'prima facie evidence of the validity'" of the copyright. (AOB 26.)

Daniels suggests that "the reason for designating the bible as published" was only Daniels's disclosure to Defendants, which she has alleged was covered by an implied contract. (AOB 50.) Such an interpretation of "publication" is directly in contrast to the definition of the word as used in the context of a copyright

[17] *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (on motion to dismiss, court may assume the contents of an incorporated document are true).

registration—namely, that there be "no explicit or implicit restrictions with respect to disclosure of its contents."  H.R. Rep. No. 94-1476, at 138.  Daniels attempts to downplay the significance of the legislative history of the Copyright Act, dismissing it as an "old text" (AOB 50), but that 1976 House Report cited by the district court is the same one that has been cited repeatedly by the Supreme Court, this Court, and other circuit courts when explicating the meaning of terms in the current Copyright Act.  *See, e.g.*, *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2505–06 (2014); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289–90 (2d Cir. 2002).[18]  Daniels claims that the district court erred by "refus[ing] to draw reasonable inferences in Daniels' favor,"  suggesting that it would be reasonable to infer that "publication" for purposes of a copyright registration means exactly the opposite of the defined meaning of "publication."  (AOB 50.)  That would likewise strain the definition of "reasonable" to the point of breakage.

Other materials incorporated by reference into the complaint are consistent with Daniels's unconditioned disclosure of the bible.  The bible itself notes that "[c]onversations are already underway with General Mills, which has expressed an

---

[18] Daniels's reliance on *Dolman v. Agee*, 157 F.3d 708, 714 (9th Cir. 1998) (AOB 51), for the meaning of "publication" for present purposes is particularly amusing given that the case involved the 1909 Copyright Act and the court was engaged in a discussion of the then-prevailing *American Vitagraph* publication standard for invalidating a copyright.  157 F.3d at 713.

interest in aligning with The Moodsters to create" a product line, and that Daniels's

team was also "in preliminary discussions with Target, which is looking at the

possibility of an affiliation with The Moodsters." (ER 195.) These assertions were

made under the heading of "Moodster™ Licensing Opportunities," boasting that

*The Moodsters* property was "ready to spread its message in all areas of the

licensing arena," and that "the property has already attracted the interest of some

potentially powerful licensing partners." (*Id.*) There would be no implied contract

governing Daniels's disclosure to these potential licensing partners: "[N]o contract

may be implied where an idea has been disclosed not to gain compensation for that

idea but for the sole purpose of inducing the defendant to enter a future business

relationship." *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902–03 (9th Cir. 1987); *see

also Faris*, 158 Cal. Rptr. at 709–10.[19]  The district court did not err in finding that

Daniels's disclosure of the idea for the Moodsters in 2005 prevented the formation

of any implied-in-fact contract with Defendants.

---

[19] The same principle applies to Plaintiffs' allegation that in the 2007 time period
they "discussed The Moodsters characters, including the merchandising potential
of The Moodsters characters, with a number of major entertainment, toy, and
publishing companies" other than Defendants.  (ER 103.)

### 3. Daniels's 2007 Publication of the *Moodsters* Pilot Prevented the Formation of Any Implied Contract, and Excused Performance Under Any Prior Implied Contract.

Daniels makes no attempt to argue that she did not publish the Moodsters pilot in 2007, and does not dispute the accuracy of the "date of publication " on the pilot's copyright registration. (SER 85–86.) Nor would it be credible for her to do so, given that archived YouTube webpages show that the pilot was posted to the internet in 2007.[20] (SER 36, 80–82, 99–102, 113–15.) Indeed, Daniels fails even to *mention* the 2007 pilot in connection with her implied contract claim. She does not contend that the district court erred in holding that the pilot had been "unconditionally disclosed" in 2007, and therefore "freely available"—preventing the formation of any implied-in-fact contract with Defendants after that point. (ER 15.) *See also Desny*, 299 P.2d at 270; Cal. Civ. Code § 1550(4). Just as in *Alexander*, Daniels's unconditioned publication of her idea in 2007, including by posting the pilot on YouTube, prevented the formation of an implied contract.

Likewise, assuming *arguendo* that the *Moodsters* bible had not been unconditionally disclosed in 2005, Daniels's undisputed 2007 publication of the

---

[20]  The district court took judicial notice of all submissions by Defendants which "figure[d] into its analysis," which included the documents showing the posting of the pilot to YouTube in 2007. (ER 13, 15.) *See UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017) ("'[T]he contents of web pages available through the Wayback Machine are facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'").

pilot—offering the idea gratuitously to anyone with an internet connection—excused Defendants from performing under any implied contract purportedly entered into before that point for failure of consideration[21] and frustration of purpose.[22]

### 4. Daniels's Distribution of the Second Generation Moodsters Products Excused Performance Under Any Prior Implied Contract.

The same principles of failure of consideration and frustration of purpose come into play as a result of distribution of the second generation Moodsters products. The district court did not consider the effect of the second generation Moodsters on Daniels's implied contract claim because, not coincidentally, the implied contract claim was dismissed with prejudice before Daniels alleged in a pleading the existence of the second generation products and their distribution and marketing. Nonetheless, this Court may affirm the district court's dismissal on any basis in the record, including the Second Amended Complaint. *See Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).

Daniels's own allegations confirm that her idea for anthropomorphized, color-coded emotions—which she contends was embodied in the second generation Moodsters—was publicly disclosed through the distribution and sale of

---

[21] *Bliss v. Cal. Coop. Producers*, 181 P.2d 369, 374–75 (Cal. 1947); Cal. Civ. Code § 1689(b)(2)–(4).

[22] *Dorn v. Goetz*, 193 P.2d 121, 123–24 (Cal. Ct. App. 1948).

Moodsters products.  Specifically, she alleged that "[b]y 2015, various products, including toys and books featuring *The Moodsters* characters, became available for sale at Target," and "[b]efore these Moodsters character products were available for sale, moreover, thousands of Moodsters toys and books were donated to schools, disaster relief programs, NGOs, and children's hospitals."  (ER 105.)  Accepting Daniels's position below that Defendants did not "use" the idea of anthropomorphized, color-coded emotions until the nationwide release of *Inside Out* in June 2015 (SER 148–50)—the accrual for the breach of implied contract— the distribution of the Moodsters products before that point dooms Daniels's implied contract claim.  Conversely, if Daniels retreats from her prior position on when an implied contract claim accrued by even one day, then the claim is time-barred by the statute of limitations because her original complaint was filed *exactly* two years after the nationwide release of *Inside Out*.[23]  In light of these facts, Daniels's decision to pursue the implied contract claim on appeal (much less in the first instance) is particularly nervy.  The district court did not err in dismissing Daniels's breach of implied contract claim with prejudice.

---

[23] This Court may affirm the district court's decision on the alternative basis that Daniels's claim is barred by the statute of limitations, an issue fully briefed and argued by both sides below.  (SER 11-13, 27–29, 148-50, 167-68.)  *See Smith v. Block*, 784 F.2d 993, 996 n.4 (9th Cir. 1986) ("In reviewing a district court decision we may affirm on any ground finding support on the record.").

## **CONCLUSION**

For the foregoing reasons, the judgment below should be affirmed.


DATED:  October 24, 2018          MUNGER, TOLLES & OLSON LLP



By:  _____*/s/ Erin J. Cox*_____
     ERIN J. COX
     *Attorneys for Defendants-Appellees*

# REQUEST FOR ORAL ARGUMENT

Defendants-Appellees request that this Court hear oral argument.

DATED:  October 24, 2018          MUNGER, TOLLES & OLSON LLP


By:   _____ */s/ Erin J. Cox* _____
      ERIN J. COX
      *Attorneys for Defendants-Appellees*

# STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, there are no known related cases to this appeal pending in the United States Court of Appeals for the Ninth Circuit.

DATED:  October 24, 2018          MUNGER, TOLLES & OLSON LLP


By:   */s/ Erin J. Cox*
      ERIN J. COX
      *Attorneys for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.  The brief is 13,902 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

DATED:  October 24, 2018       MUNGER, TOLLES & OLSON LLP


By: _____*/s/ Erin J. Cox*_____
      ERIN J. COX
      *Attorneys for Defendants-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED:  October 24, 2018          MUNGER, TOLLES & OLSON LLP


By:      */s/ Erin J. Cox*
     ERIN J. COX
     *Attorneys for Defendants-Appellees*

# ADDENDUM

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.

Although 'publication' would no longer play the central role assigned to it under the present law, the concept would still have substantial significance under provisions throughout the bill, including those on Federal preemption and duration. Under the definition in section 101, a work is 'published' if one or more copies or phonorecords embodying it are distributed to the public-- that is, generally to persons under no explicit or implicit restrictions with respect to disclosure of its contents-- without regard to the manner in which the copies or phonorecords changed hands. The definition clears up the question of whether the sale of phonorecords constitutes publication, and it also makes plain that any form or dissemination in which a material object does not change hands-- performances or displays on television, for example-- is not a publication no matter how many people are exposed to the work. On the other hand, the definition also makes clear that, when copies or phonorecords are offered to a group of wholesalers, broadcasters, motion picture theaters, etc., publication takes place if the purpose is 'further distribution, public performance, or public display.'

H.R. Rep. No. 94-1476, at 138 (1976).

Proposals have been advanced for identifying fictional characters as copyrightable works in themselves under the bill. There are undoubtedly some characters that are developed in detail and with such breadth and depth that they emerge as separately identifiable parts of the copyrighted works in which they appear. Others, perhaps the large majority, cannot be said to represent independent creations apart from the particular literary or pictorial works depicting them. As is equally true in the case of detailed presentations of plot, setting, or dramatic action, we believe it would be unnecessary and misleading to specify fictional characters as a separate class of copyrightable works.

U.S. Copyright Office, Supplementary Register's Report on the General Revision of the U.S. Copyright Law (H. Comm. Print, 89th Cong., May 1965), *available at* http://www.ipmall.info/sites/default/files/hosted_resources/lipa/copyrights/Supple mentary%20Register%27s%20Report%20on%20the%20General%20Revision%20 of.pdf